## BOARDMAN CO. v. BOARD OF COM'RS OF ELLIS COUNTY.

No. 17979. Opinion Filed Jan. 22, 1929.

Rehearing Denied April 16, 1929.

Edward Spiers, for plaintiff in error.

T. R. Blaine, for defendant in error.

BENNETT, C. The parties appear here in the same positions in which they appeared in trial court. Plaintiff sued the county commissioners of Ellis county for certain moneys alleged to be due for the construction of two bridges, and the charge for labor and material incident thereto formed the basis of two causes of action set out in the petition. Defendants filed a successful motion to make the petition more definite and certain; thereupon plaintiff amended his petition as will hereinafter appear. Defendants demurred to plaintiff's petition, and same was by trial court sustained, and plaintiff, having elected to stand upon said petition, brings the case to this court for review.

The petition, in substance, is as follows: That plaintiff is an Oklahoma corporation with principal place of business in Oklahoma City, Okla.; that defendants A. C. Oliver, F. C. Dale and B. W Clark are county commissioners of Ellis county, Okla.; that, during May, 1923, a certain bridge numbered 12 on a much traveled highway over Twenty-Five Mile creek four miles north of Gage, Okla., was destroyed by unusual high water; that said bridge belonged to the county, and its reconstruction became immediately necessary; that this was such an emergency as is provided for under laws of Oklahoma, and that, in consequence thereof, the commissioners passed a resolution of necessity providing that the said bridge should be reconstructed under direction of the county engineer of said county, and that plaintiff furnished the material and performed the labor necessary thereto; that the amount due therefor was $3,333.39, as per claim filed by plaintiff in the office of county clerk on February 20, 1924, which was audited and approved by said commissioners upon the 3rd day of March, 1924; that said plaintiff was not paid, as appears from an indorsement upon said claim, for want of funds; that at the time said material was furnished and said work performed, there were sufficient funds unexpended in said county treasury with which to pay same; that said county commissioners made and filed an estimate of the proposed needs of said county for the fiscal year beginning July 1, 1923; that the property of the county for that year was assessed at $12,487,322; that the lawful rate of levy for said year was eight mills, which would have produced the gross sum of $99,808.27 and a net sum of $90,808.05; that the amount necessary to pay for the county government, including the emergency bridges described in the petition, and the amount sued for herein, was $76,731.61; that the accounts sued for were within the income and revenues for said fiscal year, in which said accounts were made and a lawful estimate was made, filed and acted upon by the county commissioners, and that the said county excise board refused, neglected, and omitted to levy a sufficient sum of money to pay for the emergency bridges sued for in this action, and that the said county excise board did wrongfully strike from said estimate, as aforesaid, the sum of $3,333.39 for the repair of bridge No. 12 aforesaid; that a payment of $3,259.48 was made on this claim, leaving unpaid balance of $73.91.

The second cause of action is practically identical with the first, except the bridge constructed was over Wolf creek, which was destroyed by unusual high water in the month of April, 1923, and the amount of claim therefor was $15,016 27, which was presented in like manner and with like results, this claim being filed February 20, 1924, and audited and approved by county commissioners March 3, 1924, no part of which was paid. Attached to the petition are exhibits showing itemized bills for the amounts due claimed by plaintiff. There is attached also a copy of the resolution passed by the commissioners, which bears date May 26, 1923. The first petition is amended as follows:

"That in May, 1923, the board of county commissioners of Ellis county, Okla., entered into an oral agreement with the plaintiff for the reconstruction and repairing of a certain bridge over Twenty-five Mile creek, four miles north of Gage, Okla., being bridge No. 12, between sections 34 and 35, twp. 22, range 24, which bridge had been destroyed by flood, and same was for the repairing and reconstruction of same on the same site, and by virtue of an emergency."

The second cause of action bears a similar amendment except that the bridge is over Wolf creek at Fargo and the date of flood is June, 1923.

Defendants' demurrer asserted: (1) That plaintiff's cause of action was barred by limitation; (2) that the petition does not state sufficient facts to constitute a cause 'of action against defendants. A discussion of the demurrer on the latter grounds will dispose of the case.

A careful examination of the petition discloses: That in May or June, 1923, the county commissioners of Ellis county contracted with plaintiff to reconstruct on original sites certain bridges recently washed out belonging to the county, and which constituted parts of much used public highways; that plaintiff presented his claims, which were allowed by the commissioners in the spring of 1924, but payment was refused for insufficiency of funds; that, in the beginning of the succeeding fiscal year, the county commissioners filed an estimate of the proposed needs of the county, and the valuation of the property in the county is given, and the amount of money to be produced for the fiscal year 1923-24 is set out in the petition. It is further stated that, for said fiscal year, the county excise board made a levy of five mills, and that said board refused, neglected, and omitted to levy a sum sufficient to pay for said bridges,

and, further, that the said excise board did strike from said estimate, made for said fiscal year, $3,333.39 for the repair of bridge No. 12 aforesaid, and $15,027.27 for the repair of bridge No. 11, known as the Fargo bridge, and that the accounts herein sued for would have been within the income and revenue for said fiscal year, but for the action of the excise board in striking out the items aforesaid. The estimates and levy to pay for these bridges were to be made as coming within the fiscal year 1923-24, and no reference to the fiscal year 1922-23, is made in the petition except a sort of detached statement that there were sufficient funds in hand unexpended with which to pay for these bridges at the time the accounts were incurred, but in the other portions of the petition it speaks of such funds as being on hand at the time of furnishing of the labor and material for such improvements.

While we are required to construe a petition favorably to the pleader, in passing upon a demurrer, we are not called upon to close our eyes to obvious facts alleged in the petition which appear conclusive although somewhat contradictory. Here were two contracts between plaintiff and defendants involving the expenditure of thousands of dollars made just before the expiration of the fiscal year 1922-23. As appears by the exhibits attached to the petition, this work was completed on the bridge on Twenty-five Mile creek about September 15th, and on the other bridge about December 28, 1923, and the work was inspected early in 1924, so that, from the entire petition, it occurs to us to be plain that this contract had in contemplation that the work was to be paid for out of the income of the fiscal year 1923-24, or some subsequent year, and not out of the income of the fiscal year 1922-23.

It appears from the petition that the county commissioners made and filed an "estimate of the proposed needs of said county for the fiscal year beginning July 1, 1923, * * * including the bridges and emergency bridges given in this petition and the accounts herein sued for. * * *"

Our first inquiry, therefore, is: When was this contract made and the obligation (if legal) incurred?

In the case of Town of Red Fork v. Gant Baker Co., Inc., 130 Okla. 175, 266 Pac. 444, the court discusses a case, wherein an engineer was employed April 1, 1925, to do certain preliminary work necessary to the construction of a waterworks plant, agreeing to pay him a certain percentage out of

the proceeds of a bond issue, which was to be, and later was, voted, to pay for such improvements, and in August following, the town repudiated its contract with plaintiff. It was urged that the accepted proposal created no liability against the town until the bonds were voted, and quoting from the case of O'Neil Engineering Co. v. Incorporated Town of Ryan, 32 Okla. 738, 124 Pac. 19, the court says: ·

"We think the contract in this case attempted to impose a present obligation and liability upon defendant, notwithstanding the contingency as to payments to be made thereunder. So far as the city officers were concerned, nothing further was to be done by them. No option of any kind was to be exercised by them. The contract was not to be, and was not, submitted to the voters. It was plainly and manifestly the purpose and plan of the parties to anticipate the action of the voters—let the plaintiff in on the 'ground floor'—and in effect, appropriate and expend the funds before they were provided. It would certainly be unfortunate, were we compelled to sustain the contention made by plaintiff."

And Mr. Commissioner Leach says, in the body of the opinion:

"It appears that the contract sued upon in the instant case, under the holdings in the cases cited, in effect, was to incur a present obligation or indebtedness against the defendant town, and was void, because there were no funds on hand or levy out of which payment could be made; no vote of the electors had authorized the creation of such obligation or indebtedness, as required by section 26, art. 10, of the Constitution."

Flood v. Town of Shidler, 127 Okla. 148, 260 Pac. 52, was a case in which the trustees of the town of Shidler contracted with Flood to act as official engineer of said town, and perform all engineering services incident to the completion and carrying out of all contracts which said town should enter into during the period of two years. As compensation he was to receive five per cent. of the cost to said town of such construction. No funds were on hand or provided to pay such expenses. Later, bonds to provide for the construction of a waterworks system were voted. Flood, who had theretofore prepared preliminary specifications for said waterworks system, offered his further services, as provided in said contract, but the same were refused, and the town employed another engineer. It was held that said contract created a present indebtedness against the town, and was, therefore, in conflict with section 26, art. 10 of the Constitution, and void.

Mr. Justice Mason, in the opinion, says:

"Counsel for plaintiff, however, seek to take this contract from under the operation of the Constitution, * * * by the claim that under the terms of the contract no particular work was contracted for, and that it took some action on behalf of the city in order to create any liability under this contract: the contention being that because of that provision, the contract was not enforceable until after the bond funds were received; that, therefore, at the time of making the contract, no indebtedness was incurred, because there was no present obligation to pay; and that the indebtedness arose, in law, when the bond funds were received, and, therefore, at a time when the indebtedness could be enforced. This same contention was made in the case of O'Neil Engineering Co. v. Incorporated Town of Ryan, 32 Okla. 738, 124 Pac. 19, which presented a much stronger case in favor of the losing party than does the case at bar in favor of the plaintiff. In that case, the board of trustees of the town of Ryan, having in contemplation the construction of a system of waterworks and sewers and a light plant, to be afterwards submitted to the voters of the town for their adoption, by voting a bond issue for that purpose, on November 30, 1908, entered into a contract with the O'Neil Engineering Company for it to prepare and furnish plans and specifications therefor, with an estimate of the cost of construction, and, after the bonds · were voted, to superintend the construction and do certain work to be paid for as stipulated in the contract; the contract further providing that nothing should be due and payable until the bonds had been voted, sold and paid for. * * * In the body of the opinion, Mr. Justice Brewer (in O'Neil Engineering Co. Case, supra) used the following language: 'We think the contract in this case attempted to impose a present obligation,'" etc., the same quotation referred to in the case of Town of Red Fork v. Gant-Baker Co., supra.

In the case at bar the facts are stronger than in either of the cited cases, for the reason that the contract pleaded by plaintiff was subject to no sort of condition or limitation. It was a contract whereby plaintiff bound himself to build, and the county assumed to bind itself to pay for, certain bridges. There was nothing for the county to do. There was no option to be exercised. From the moment the contract was made, if indeed it were valid, the parties became bound to carry out its terms. So that, it cannot be urged that the contract was not entered into until after the expiration of the fiscal year 1922-23. Having concluded that the obligation sought to be enforced was entered into, as it was alleged by plaintiff to have been entered into, in May

or June, 1923, and that, under all the allegations in the petition and the exhibits, said contract had in contemplation the payment of plaintiff out of taxes subsequently to be laid and collected and upon estimates made for the fiscal year 1923-24, our next inquiry is: What was the effect of such an arrangement? Was it legal and enforceable against the county? This inquiry must be answered by the construction and application to the facts of pertinent constitutional and statutory provisions.

Section 26, art. 10, of our Constitution provides:

"No county, city, town, township, school district, or other political corporation, or subdivision of the state, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of three-fifths of the voters thereof, voting at an election, to be held for that purpose, nor in cases requiring such assent, shall any indebtedness be allowed to be incurred to an amount including existing indebtedness in the aggregate exceeding five per centum of valuation of the taxable property therein, to be ascertained from the last assessment for state and county purposes previous to the incurring of such indebtedness. * * *"

We hazard the opinion that there can be found in our Constitution no provision couched in clearer or more comprehensive terms than this section. There is not even the possibility of ambiguity or misunderstanding as to what is meant. It definitely names the municipalities, and then, for fear of some uncertainty, the words "or other political corporation, or subdivision of the state" are added so as to make its terms clear beyond dispute. The words "shall be allowed to become indebted, in any manner," are as broad as human language permits, but to make sure, the alternative words "or for any purpose" are used; and the extreme solicitude of the authors of the Constitution may be seen also in the following words which are almost redundant in their insistent certainty "to an amount exceeding, in any year, the income and revenue provided for such year." What was uppermost in the minds of those who wrote this document, which is our fundamental law? The one purpose was to safeguard the citizens and taxpayers of the state against the inadvertence, carelessness, the profligacy and the corruption of public officials charged with the handling of public moneys. That provision is subject to no exigency, pays no heed to convenience, expediency or emergency. It is sane, safe, unconditional, and, so far as human documents can be so regarded, should be held sacred in its observance, interpretation and enforcement. Once this clear protecting mandate is whittled away, reasoned around, or disregarded, for any cause, the chief guaranty of our orderly municipal progress, whether in state, county, city, town, township or school district, is threatened. This is no new law—it has been with us since statehood. It is only a hardship to those who will not take the time to ascertain their rights, or to those who, knowing their rights, dare to gamble on a sympathetic jury, or on a weak-kneed or indulgent court, to allow them a privilege which the people of our state have said no one shall enjoy. Contractors and others who encourage or join in with public officials charged with the care of the public funds in entering into contracts on credit, and for the payment of which they have no money in hand, are alone responsible for their losses, for this clear-cut inhibition and prohibition is addressed by the people of the state, through their Constitution, to the private citizen, to the contractor, to the taxpayer, to jurors, courts, and judges, and they are all alike charged with the observance and enforcement of this highly necessary constitutional safeguard.

Our law books are full of cases involving attempts to break down, or to disregard, or upon one count or another to reason around, the plain terms of this or other similar provisions, and it might be said at times the courts have seemed to be somewhat unsteady in the face of some ostensible emergency, or where some particular case had some sympathetic appeal. There has been an obvious effort by the Legislature to follow out the limitations prescribed in section 26, art. 10, of the Constitution. Section 9701, C. O. S. 1921, provides:

"Whenever the public welfare or the needs of any county, township, city, town or school district shall require, the excise board may, on call of the chairman, convene at any time for the purpose of making supplemental or additional appropriations for current expense purposes; provided, that all such appropriations authorizing the creation of an indebtedness, shall come within the limitations of section 26, art. 10, of the Constitution. No supplemental or additional appropriation shall be made for any county, township, city, town or school district in excess of the income and revenue provided or accumulated for the year. * * *"

Section 9699, C. O. S. 1921, after providing the manner of making the estimate and provisions for raising revenue to meet the estimate, says:

"The several items of the estimate as made and approved by the excise board for each

fiscal year shall constitute and are hereby declared to be an appropriation of funds for the several and specific purposes named in such estimate, and the appropriation thus made shall not be used for any other fiscal year or purpose whatsoever. Each clerk or other issuing officer shall open and keep an account with the amount of each item of appropriation showing the purpose for which the same is appropriated and the date, number and amount of each warrant drawn thereon. No warrant, or certificate of indebtedness in any form, shall be issued, approved, signed, attested or registered on or against any appropriation for a purpose other than for which the said appropriation was made, or in excess of the amount thereof."

Section 9702, C. O. S. 1921, is as follows:

"The term 'appropriation,' as used herein, is hereby declared to be synonymous with 'estimate made and approved,' as defined in section 3, chapter 80, Session Laws 1911 (8633), and the provisions, requirements, limitations and penalty of said chapter 80, Session Laws 1911 (8631-8639), are hereby specifically declared to extend to and embrace 'appropriations' as herein defined."

Section 8638, C. O. S. 1921, is as follows:

"It shall be unlawful for the board of county commissioners, * * * to make any contract for, incur, acknowledge, approve, allow or authorize any indebtedness against their respective municipality or authorize it to be done by others, in excess of the estimate made and approved by the excise board for such purpose for such current fiscal year, or in excess of the specific amount authorized for such purpose by a bond issue. Any such indebtedness, contracts incurred, acknowledged, approved, allowed or authorized in excess of the estimate made and approved for such purposes for such current fiscal year, or in excess of the specific amount authorized for such purpose by a bond issue, shall not be a charge against the municipality whose officer or officers contracted, incurred, acknowledged, approved, allowed or authorized or attested the evidence of said indebtedness, but may be collected by civil action from any official contracting, incurring, acknowledging, approving or authorizing or attesting such indebtedness, or from his bondsmen."

And the succeeding section (8639) provides, in substance, that any officer contracting, incurring, acknowledging, authorizing, allowing or approving any indebtedness, etc., contrary to the terms of the preceding section shall be guilty of a misdemeanor, and upon conviction shall be fined not less than $100 or more than $1,000, and shall forfeit and be removed from his office.

"A debt which is in excess of the constitutional or statutory limit is void; and in no form can such debt be held valid upon any theory of quantum meruit, or equitable obligation. The absolute lack of power to contract such indebtedness bars every form of action and every legal device by which recovery is sought; nor will the courts aid the vendor to recover the property sold and delivered under such illegal contract." Fairbanks-Morse Co. v. City of Geary, 59 Okla. 22, 157 Pac. 720.

To the same effect are the following cases: Huddleston v. Board of Commissioners of Noble Co., 8 Okla. 614, 58 Pac. 749; In re Town of Afton, 43 Okla. 720, 144 Pac. 184; Haskins & Sells v. Oklahoma City, 36 Okla. 57, 126 Pac. 204; Vincennes Bridge Co. v. Board of County Commissioners of Atoka County, 248 Fed. 93, 160 C. C. A. 233. In the case of Litchfield v. Ballou, 114 U. S. 190, the Supreme Court of the United States, in passing upon a similar provision of the Constitution of Illinois, said:

"It shall not become indebted. Shall not incur the pecuniary liability. It shall not do this in any manner. Neither by bonds nor notes, nor by express or implied promises. Nor shall it be done for any purpose. No matter how urgent, how useful, how unanimous the wish."

It seems clear to us that the law, in order to be consistent, should not lend its support to a claim founded upon a violation of the law, and especially where the breach is against both the Constitution and the statute law.

There is a very careful and painstaking discussion of this entire matter in Mayer v. J. T. Jones & Sons, 113 Okla. 119, 239 Pac. 904. In the case of Dougherty-Nichols Construction Co. v. Town of Jenks, 115 Okla. 104, 242 Pac. 167, the second paragraph of the syllabus reads:

"One who demands payment of a claim against a city must show some statute authorizing it, or that it arose from some contract, express or implied, which finds authority of law, and it is not sufficient that the services performed, for which payment was claimed, were beneficial."

The third paragraph is as follows:

"A claim against an incorporated town or city for material furnished and services rendered in completion of a sewer and water system, which is in excess of the fund created for the purpose of defraying the expense of constructing such sewer and water system, and which is incurred after the fund has been exhausted, is not a legal liability against the town or city."

Our attention has been called by the appellant to the case of Fabric Fire Hose Co.

v. Town of Caddo, 59 Okla. 89, 158 Pac. 350, but in the case of Dougherty-Nichols Construction Co. v. Town of Jenks, supra, it says, referring to the Fabric Fire Hose Co. Case, supra:

"But, in that case, the town of Caddo had issued a warrant in part payment of the claim, and the opinion further disclosed that a settlement or compromise had been made, and the city had agreed to pay $700, and nothing appeared in the record in that case to show that there were no funds available, and the fact that a warrant had been issued against some fund would at least be presumptive evidence, in the absence of any direct proof to the contrary, that there was a fund available."

"One who demands payment of a claim against a county must show some statute authorizing it, or that it arises from some contract, express or implied, which finds authority of law; and it is not sufficient that the services performed for which payment is claimed were beneficial." Board of Commissioners of Washita County v. Brett, 32 Okla. 853, 124 Pac. 57.

This last case is cited with approval in the Dougherty-Nichols Construction Co. Case, supra. In the case of United States Rubber Co. v. City of Tulsa, 103 Okla. 163, 229 Pac. 771, the second and third paragraphs of the syllabus read as follows:

"Whoever deals with a municipality does so with notice of the limitations on it or its agents' powers. All are presumed to know the law and those who contract with it or furnish it supplies do so with reference to the law, and if they go beyond the limitations imposed, they do so at their peril.

"A contract not in its origin obligatory upon the corporation, by reason of not having been made in the mode prescribed by the charter, cannot be affirmed and ratified in disregard of that mode by any subsequent action of the corporate authorities, and a liability be thereby fastened upon the corporation." (Citing Perry Water & Ice Co. v. City of Perry, 29 Okla. 593. 120 Pac. 582; McKinney v. City of Wagoner, 45 Okla. 28, 144 Pac. 1071; Buckeye Engine Co. v. City of Cherokee, 54 Okla. 509, 153 Pac. 1166; Mitchell v. City of Atoka, 76 Okla. 266, 185 Pac. 96; Board County Commissioners of Tulsa County v. Tulsa Camera Record Co., 103 Okla. 35, 228 Pac. 1103.

In the United States Rubber Co. Case, supra, in the body of the opinion, quoting from McQuillin, Municipal Corporations, sec. 1164, the court says:

"'And if the municipality is suffered to disregard them and the other contract party is nevertheless permitted to recover for the property delivered, or the services rendered, either on the ground of ratification, estoppel, or implied contract, then it

follows, as the night the day, that the statute or charter provision can always be evaded and set at naught.' * * *

"It is better that an individual should occasionally suffer from the mistake of public officers or agents than to adopt the rule which through improper combination or collusion might be turned to the detriment or injury of the public. Whiteside v. U. S., 93 U. S. 247."

We are referred by plaintiff to the case of City of Woodward v. Manhire Grate & Equipment Co., 98 Okla. 83, 224 Pac. 356, which holds that, where a valid contract of sale is entered into in accordance with the requirements of law, it will not be invalid by any subsequent diversion of the funds, and also to the case of Fabric Fire Hose Co. v. Caddo, supra, and the case of Oklahoma City v. Derr, 109 Okla. 192, 235 Pac. 218. We see no reason to criticise the holding in these cases which deal either with valid contracts or contracts which had been covered by warrants, which, in the nature of things, are prima facie correct.

But, on the direct question as to whether or not the contract as made is legal, plaintiff relies upon and cites but one statutory authority, to wit, section 10102, C. O. S. 1921, which reads as follows:

"The board of county commissioners may pay for the reconstruction or repairing of such county bridges as have been heretofore, or may be hereafter, damaged or destroyed by floods, and including bridges where the same, by reason of an emergency, have been repaired or reconstructed by any person or persons, without first having contracted to repair or reconstruct the same with said county commissioners; provided, that the authority granted by this section shall apply only to claims for repairing or reconstructing bridges previously owned by the county on the same site."

It is not necessary for us to construe this section, or to determine its intent, further than to say that it does not, in terms, pretend to give the right to county commissioners to make a legal contract in one fiscal year to be paid out of the funds of a succeeding year in contravention of the plain words and intent of the Constitution and of the various statutes in recognition thereof; but if, in fact, it did attempt to give them such a right, it would be without force because it would violate the plain provisions of the Constitution. Our attention is drawn to the case of Schulte v. Board of County Commissioners, 119 Okla. 261, 250 Pac. 123, and plaintiff relies almost exclusively upon the construction of section 10102, C. O. S. 1921, in that case. In said case the action was brought upon certain

judgments which appeared regular, and which had been entered by a court of proper jurisdiction, and said action was combined with a suit by the county commissioners to fund the indebtedness of the county represented by the judgments. There was an intervention by a taxpayer who set out that the judgments were taken without color of law and by collusion. The case proceeded and was determined largely upon the theory that the judgments, when rendered, were not subject to attack upon that ground and in that method, and the court in the opinion says:

"It is apparent that the validity of the indebtedness sought to be refunded must be measured by the legal and equitable rules ordinarily applied to determine the sufficiency of such evidence of indebtedness.

"The section authorizes the funding of judgments, and this is the only class of indebtedness involved in this action. The several sections do not define the ground for attack against judgments. There is no indication that it was the purpose of the Legislature to permit the attack of judgments in the funding proceedings upon grounds other than those authorized by the general law. Therefore, it is material to determine whether a distinction is made between the grounds for collateral attack of a judgment against municipal corporations and the collateral attack of a judgment between individuals."

And the court concludes the discussion of this point as follows:

"The rule adopted by this court in relation to matters concluded by a judgment is that a judgment concludes all matters presented within the issues in the trial of the cause, and those matters which might have been presented in support of the right to recover or in defense of the action. Board of County Commissioners, Day County v. State of Kansas, 19 Okla. 375, 91 Pac. 699; Okla. Moline Plow Co. v. Smith, 81 Okla. 61, 196 Pac. 962; Brown v. Calvert, 57 Okla. 364, 157 Pac. 284; Johnson v. Gillett, 66 Okla. 308, 168 Pac. 1031; Bellamy v. Washita Valley Tel. Co., 25 Okla. 792, 108 Pac. 389."

The court held likewise that there was no evidence of fraud sufficient to invalidate the judgment. The court further in the opinion says:

"The respondent failed to show that the claimants were guilty of collusive acts with the county in creating the claims, and in the procurement of the judgments. A different question would be made by the respondent, if he had proved the fraud which he charged. * * * It is for the charging party to prove the facts alleged as constituting the fraud; it is for the court to determine whether such acts, in equity, constitute fraud. Oklahoma Pet. & Gasoline Co. v. Winship, 83 Okla. 146, 200 Pac. 844."

The court continues:

"The ground for cancellation relied upon by the respondent as shown by the proof was involved in the first trial of the cause. The respondent abandoned his equitable grounds for cancellation in his proof, and relies purely upon legal grounds; that is, that the several claims sued upon in the Wells Case exceeded the estimate made for the several fiscal years in which the claims were created."

And, later, the court calling attention to section 10102, C. O. S. 1921, discusses the meaning of this act, and uses these words:

"If we construe the section as meaning that the commissioners are relieved from giving the usual public notice for the letting of the bridges, but that they must first provide funds, which ordinarily would require a bond issue before letting the contract, the statute is meaningless and affords no relief in the situation. To place the latter construction upon this section is to say that the action of the Legislature was aimless, and without any purpose to provide remedial and speedy relief in such an emergency. The legislative department was passing an act in relation to the reconstruction of a bridge destroyed by means which could not have been foreseen or anticipated. The county, therefore, could not have provided funds, or made provisions for restoring the public highway to use."

Here, if language means anything, the court is using, it seems to us, the most specious reasons for denying the force of the Constitution. First, it says that the legislative act was aimless, if a certain meaning is not given it, which we believe to be in plain contravention of the Constitution. Second, there was an emergency—travel over a public road had been inconvenienced by the washing out of a bridge, and therefore the Constitution must be ignored. Third, the county commissioners could not have foreseen, and therefore could not have provided for such an emergency by collecting taxes. Is it more to the interest of the public that the few people who travel on a particular highway shall be able to cross at a certain bridge than it is that a constitutional provision intended to protect the taxpayers and the public as well shall be ignored? To our minds these reasons are unsound. The court, in the Schulte Case, also argues as if it were conclusive that the need for that bridge had already been passed upon in the first construction by the citizens and property owners of the county, and its location fixed at a particular place on a particular highway, and, therefore,

the commissioners should be allowed to rebuild the same without taking heed of ordinary legal requirements. This to our way of thinking is a false premise. The people might have been willing to vote the first bridge. Conditions may have changed, and they might have been unwilling to vote the second bridge. The cost of the first bridge might have been within their means, whereas, that of the second might be beyond their ability. It is as illogical as it is to say that a house destroyed by fire might be replaced by the original contractor at the same location without another contract. While we cannot follow the reasoning of the court above outlined in the Shulte Case, it is only fair to the judge rendering the opinion to say that he declared in the opinion:

"It is necessary to ascertain the meaning of this section (10102, C. O. S. 1921), in order to determine the intent and motive of the county commissioners, so that we may judge from their actions whether the contracts and judgments were the result of fraud and collusion among the parties. * * * We are construing the section and its probable meaning in order to determine the motives and intentions of the parties in entering into the contracts, the intention of the parties, and the trial judge in rendering judgments upon the claims. * * * It is not necessary for us to go farther in construing the section than to determine probable construction placed thereon by the parties in letting the contracts to replace the bridges, and in securing judgments on the contracts. * * * We think the provisions of the section were sufficient to justify the plaintiffs and defendants in believing that they were proceeding in a lawful manner in rebuilding the bridges on the old sites, and in reducing the contracts to judgments. * * *

"The parties in the latter case (Threadgill v. Peterson, 95 Okla. 187, 219 Pac. 389), contracted for repairs to the extent of $3,250 to be made on a schoolhouse situated in the town of Coalgate. The contract was made contrary to the plain provisions of the law. No levy had been made for this particular work, nor did the school district have funds to pay for the repairs. Both parties entered into the contract contrary to the plain provisions of the law. * * * Since the contract was null and void according to plain provisions of the law, the parties were charged with bad faith in reducing the void contract to judgment. The actions of the parties in this respect may be termed legal fraud. A judgment resulting from collusive acts of the parties, which amounts to legal fraud, is subject to direct or collateral attack. * * * We would apply the same conclusions here, if the record presented the same questions as were involved in the Threadgill Case."

We think that much of the reasoning in the Schulte Case is so unsound as to warrant us in overruling the same, but for the fact that the court appears to have been making a study of section 10102, supra, and its **probable** meaning in order to determine whether the intention of the contracting parties in entering into the contracts and the intention of the judge in rendering judgment thereon were fraudulent and collusive. That case seemed to turn upon the conclusion that the judgments rendered by courts of proper jurisdiction, fair upon their face, are binding upon all parties thereto upon all questions which should have been raised at the time they were rendered. Our attention was not called in the brief to the case of Smartt, Sheriff, v. Board of County Commissioners of Craig County, 67 Okla. 141, 169 Pac. 1101, wherein the sheriff of Craig county was allowed compensation for feeding prisoners, etc., after the estimate made and approved for such purpose for the current fiscal year had been exhausted. Justice Branson says, in the case of Threadgill v. Peterson, supra, speaking of the Smartt Case:

"In brief, the difference between the liability there and in the case at bar is that one was a liability arising by operation of law, and the other arising by operation of contract."

It has been many times declared that the intention of this constitutional provision and the supporting statutes was to cause municipalities to operate upon a cash basis or "pay-as-you-go" plan, and that each fiscal year must meet its own burdens. Edwards v. School District No. 222, 117 Okla. 269, 235 Pac. 611, and cases cited. We think the most casual perusal of the petition and exhibits in this case will disclose that the observance of this policy was not in contemplation by either party.

Where a party in making out his case fails to prove sufficient facts, or proves a state of facts precluding recovery, and defendant demurs, the same should be sustained. Yingling v. Redwine, 12 Okla. 64, 69 Pac. 810; Pringey v. Guss, 16 Okla. 82, 86 Pac. 292; Norman v. Groves, 22 Okla. 98, 97 Pac. 561; Williams v. Williams, 87 Okla. 195, 209 Pac. 769.

We have discussed at considerable length this very important provision of our Constitution and the statutes of our state passed in recognition thereof. We cannot escape the conclusion that no mere device of words or circumstances bringing about an emergency or expediency should warrant us in holding that this provision does

not mean exactly what it says, and we think it a wholesome position to again declare that our courts should and will adhere to the plain meaning of the constitutional provision. For which reasons, we hold that the judgment of the trial court should be affirmed.

REID, HERR, HALL, LEACH, and FOSTER, Commissioners, concur.

By the Court: It is so ordered.