**DOWLER** et al. v. **STATE** ex rel.
**PRUNTY** et al.

No. 22617. Feb. 2, 1937.

Rehearing Denied April 6, 1937.

J. E. Curran, Peyton E. Brown, and John S. Burger, for plaintiffs in error.

Sargent & Ross, Simons, McKnight, Simons, Mitchell, & McKnight, for defendants in error.

Arthur B. Honnold, Paul Avis, I. J. Underwood, and O. L. Lupardus, amici curiae.

WELCH, J. This action was instituted under sections 5964 and 5965, O. S. 1931, which sections authorize suit by a taxpayer

to recover double the amount of money wrongfully expended by public officials from the public funds. Judgment was had below against the defendants M. M. Lively, Max M. Fife, and A. L. Hess, city commissioners of the city of Blackwell, and against the defendant H. M. Dowler.

The facts are, in substance, that Dowler was the record owner of approximately 160 acres of real estate near the city. The city commissioners desired to acquire it for the city for public park and airport purposes. In June, 1928, they obtained from Dowler an option for twelve months to purchase the entire tract, or any portion thereof, at $200 per acre. Thereafter the land was conveyed to the city by eight separate deeds, each conveying approximately 20 acres. The consideration therefor was paid by eight city warrants authorized and issued by the defendant commissioners; one was dated in June, 1928, and paid June 30th in the fiscal year 1927-28; the other seven were dated after July 1st, and were paid in the fiscal year 1928-29. The warrants were drawn upon and paid out of the general fund of the city in the total sum of $31,400. No appropriation whatever was made in either of the fiscal years involved, for the purchase of this or any other park or airport property, as such appropriations are referred to and contemplated in sections 12674, 12677, 12678, 12679, and 12681, O. S. 1931. The city commissioners, in their annual estimate of the expenditure needs of the city, did not set up or state any need for expenditures for this purpose, and requested no appropriation therefor.

The plaintiff's action was based upon the theory that the expenditure of said funds in such manner was an unauthorized and unlawful expenditure of the public funds of the city of Blackwell for two reasons: (1) That such funds could not be so expended unless there had been an appropriation therefor or an estimate made and approved therefor; and (2) that such expenditure was in violation of the terms of the city charter that purchase of property be first authorized by vote of the people, or be preceded by publication of notice of intention in the required manner.

For reversal of the judgment rendered in favor of plaintiff, the defendants set out 47 assignments of error, all of which are presented under the following nine propositions:

"1. Plaintiff had no right to institute or maintain the action because the required written notice and demand was not made by ten resident taxpayers.

"2. Each wrongful payment creates a separate cause of action and requires a separate written demand before suit; and plaintiff's single demand for the aggregate of eight separate payments was insufficient to entitle him to institute suit.

"3. The plaintiff had no right to institute or maintain the action because no proper security for cost was given as required by statute.

"4. The trial court erred in refusing to require plaintiff to separately state and number the eight causes of action constituted by the eight wrongful payments set out in plaintiff's petition as one cause of action.

"5. The charter of the city of Blackwell does not require an election or notice to be given of intention to buy real estate.

"6. The defendant commissioners had a right to purchase this real estate for a public park and to devote a reasonable portion thereof to an airport and aviation field.

"7. This property having been purchased from the profits from the municipally owned light and water plant and not from taxes, it was not necessary that an estimate be made by the city commissioners or an appropriation by the excise board of Kay county, Okla.

"8. The court erred in sustaining plaintiff's demurrer to that portion of defendants' answer which pleaded ratification by the city of Blackwell.

"9. The court erred in sustaining the demurrer of the plaintiff to that portion of the defendants' answer which pleaded the validating act of the Legislature."

And in addition thereto, the defendant Dowler individually urges error in the overruling of his separate demurrer to the evidence, and in overruling his separate motion for an instructed verdict.

In considering defendants' first proposition we observe the following statutory provisions:

Section 8590, C. O. S. 1921 (5964, O. S. 1931), in so far as applicable here, provides, in substance, that every officer of any city, who shall order or direct the payment of any money of the city in settlement of any claim known to such officer to be in pursuance of any unauthorized, unlawful, or fraudulent contract, and every person having notice of the facts, with whom such unauthorized contract shall have been made, or to whom such money shall be paid, shall be jointly liable to the city for double the amount of such sums of money so paid, to

be recovered at the suit of the proper officers of the city, or of any resident taxpayer thereof, as hereinafter provided.

The following section, 8591, C. O. S. 1921 (5965, O. S. 1931), in so far as applicable here, provides, in substance, that upon the refusal of the proper officers of any city, after written demand made upon them by ten resident taxpayers of such city to institute proper proceedings for the recovery of any money belonging to the city paid out in pursuance of any unauthorized or unlawful contract by any of its officers for such city, any resident taxpayer, after serving the notice aforesaid, and after giving security for costs, may in the name of the state of Oklahoma, as plaintiff, institute and maintain any proper action which the proper officers of the city might institute and maintain for said penalty, and that one-half of the amount of money recovered shall be paid to the resident taxpayer maintaining the action as a reward.

Our attention is called to Territory ex rel. Johnston v. Woolsey, 35 Okla. 545, 130 P. 934; Bullington v. Lowe, 94 Okla. 234. 221 P. 502; McGuire v. Skelton, 36 Okla. 500, 129 P. 739; State ex rel. v. Drumright, 88 Okla. 244, 212 P. 991; State ex rel. Schilling v. Oklahoma City, 67 Okla. 18, 168 P. 227; Baugh v. Little, 140 Okla. 206, 282 P. 459. Most of these cases support the rule that the above-quoted section of the statute must be strictly complied with by plaintiff in order to maintain his action. The notice served upon the defendants here in plaintiff's effort to comply with the provisions of section 8591, supra, contained the signatures of 13 persons. The defendants' position is that plaintiff's evidence fails to sustain the conclusion that as many as ten of these persons were resident taxpayers of the city of Blackwell, either at the time the notice was served or at the time the suit was commenced, or at the time judgment was rendered. The notice was served March 22, 1929. Suit was filed April 17, 1929, and the trial was had and judgment rendered in March, 1931. The defendants proceeded with an analysis of the testimony relating to the status of each of the individual signers; such analysis of the testimony and their conclusions and contentions are probably best illustrated by what they say with reference to the plaintiff, Prunty, as follows:

"The evidence offered on behalf of the first signer, the plaintiff, F. O. Prunty, to show he was a resident taxpayer, consisted of two tax receipts, shown at pages 538 and 539 of the case-made. He had testified over objections, to the legal conclusion that he was a taxpayer during the year 1928, but he did not testify that he was a taxpayer during 1929. However, the basis of his testimony was these two tax receipts. The first of these showed taxes paid on June 10, 1929, almost three (3) months after the demand was served, and long after the suit was filed. The second showed taxes paid March 14, 1930, a year after the suit was filed. No testimony shows payment of taxes of the Blackwell property prior to these years. Prunty's evidence, therefore, showed that although he was a resident he was not a taxpayer until long after the notice was served and the suit filed. This evidence, therefore, not only strikes his name from the signers of the written demand, but defeats his right to institute the action as his status as a resident taxpayer must be proved to exist, not only when the suit is filed, but until the adjudication is made. Baugh v. Little, 140 Okla. 206, 282 P. 459.''

An examination of the record discloses that plaintiff testified in this connection that he lived in Blackwell; had lived there 14 or 16 years; is a resident of Blackwell, and was such resident during the year 1928, and was at that time a taxpayer therein, and that he owned property in Blackwell, and owned property therein during the year 1928, describing it as being real estate, and that he paid taxes on it. He identified tax receipt dated June 6, 1929, covering last half of taxes for the year 1928, and identified tax receipt dated March 14, 1930, as being the first half of the 1929 taxes.

We think the rule in arriving at the correct definition of the term "taxpayer," as used in the quoted section of our statute, is aptly stated in 61 C. J., page 1748:

"The generally accepted definitions of a taxpayer are: A person chargeable with a tax, or who owning property in the state, or within the territory, is subject to taxation; one from whom government demands a pecuniary contribution toward its support; one who is liable for the payment of taxes; one who is subject to and liable for a tax; one who owns property, within a town or municipality, subject to taxation; one who pays a tax, also one who pays any tax or taxes, or regularly pays taxes. The term has been specifically defined in particular statutes. The term as employed in a particular case may or may not imply an actual payment of taxes. The word has been distinguished from 'citizen,' 'freeholder,' and 'legal voter.' "

It would unduly lengthen this opinion to discuss in detail the evidence as pertains to each individual signer of the petition, but

we have made a careful examination and analysis of the evidence in this regard, and conclude that such evidence is sufficient to sustain a finding and conclusion that the notice and demand contained a sufficient number of resident taxpayers to satisfy the requirements of the statute. The discussion herein regarding the evidence as to Prunty's status as a resident and taxpayer, although not identical, of course, with the testimony as to the status of the other signers, is in our opinion fairly illustrative of the same.

We next consider defendants' proposition No. 2, as follows:

"Each wrongful payment creates a separate cause of action and requires a separate written demand before suit; and plaintiff's single demand for the aggregate of eight separate payments was insufficient to entitle him to institute suit."

We quote the applicable portion of the notice and demand thus attacked:

"You and each of you are hereby notified that we the undersigned hereby demand that you institute and diligently prosecute proper proceedings at law or in equity for the recovery of the sum of about 31,400, paid by A. L. Hess, M. M. Lively, and Max M. Fife, as City Commissioners of the City of Blackwell, Oklahoma, to H. M. Dowler, agent, together with a penalty of $31,400.00 as provided by law for the purchase of the Southwest Quarter of Section Twenty-one (21) Township Twenty-seven (27), North, Range One (1) West, of the I. M. Kay County, Oklahoma.

"The said purchase being evidenced by deeds to the City of Blackwell, as follows, to wit:

"One dated June 30, 1928, and recorded on September 13, 1928, in book 93 at page 447 of the Deed Record, in the office of the County Clerk's office of Kay County, Oklahoma.

"One dated July 11, 1928, and recorded on August 19, 1928, in book 93, at page 466, of the Deed Record in the office of the County Clerk's office of Kay County, Oklahoma.

"One dated July 18, 1928, and recorded on September 24, 1928, in book 93 at page 486 of the Deed Records in the office of the County Clerk's office of Kay County, Oklahoma.

"One dated July 18, 1928, and recorded October 1, 1928, in book 93 at page 524 of the Deed Record in the office of the County Clerk's office of Kay County, Oklahoma.

"One dated November 9, 1928, and recorded March 11, 1929, in book 96 at page 405 of the Deed Record in the office of the County Clerk's office of Kay County, Oklahoma.

"One dated January 7, 1929, and recorded March 11, 1929, in book 96 at page 404 of the Deed Record in the office of the County Clerk's office of Kay County, Oklahoma.

"One dated January 7, 1929, and recorded March 11, 1929, in book 96 at page 407 of the Deed Record in the office of the County Clerk's office of Kay County, Oklahoma.

"One dated February 19, 1929, and recorded March 11, 1929, in book 96 at page 406 of the Deed Record in the office of the County Clerk's office of Kay County, Oklahoma.

"The said resident taxpayers represent and show that the aforesaid commissioners did without any authority, unlawfully and fraudulently purchase from the said H. M. Dowler, agent, the property described in the various deeds hereinbefore set forth, and did without any authority unlawfully and fraudulently pay to the said H. M. Dowler, agent, the sum of $31,000 as consideration therefor.

"Said resident taxpayers further represent and show that if proper action is not instituted immediately and diligently prosecuted, that the interests of the taxpayers of the city of Blackwell cannot be preserved."

The defendants call our attention to section 8590, C. O. S. 1921, and make the following observations:

"It is obvious from this section and from the decisions of this court that the wrongful act penalized is the wrongful payment of any particular sum of public money; that each payment of any sum creates a separate and distinct liability and forms the basis of a separate suit. Each payment is therefore a separate cause of action which can be sued upon independently of any other wrongful payment and each requires a separate written notice and demand as a prerequisite to instituting and maintaining an action thereon"

—which seems to disclose the gist of their contention in this regard. The defendants point out that, although the option to purchase was acquired of Dowler in June, 1928, the city thereunder was not bound to purchase the land, but might purchase the smallest portion thereof from time to time up to the date of the end of the option, paying therefor at the rate of $200 per acre. They contend that the purchase thereafter of the several tracts, and the payment therefor at separate times and by separate warrants, each constitute a separate and distinct transaction, and that each transaction would require a separate legal demand before suit, under provision of section 8591, supra.

We have not overlooked the rule that re-

quires a strict construction of the statute relative to the giving of notice in such cases, but we know of no rule which requires such a technical construction as would destroy the obvious purpose of the law. There are no technical requirements contained in the statutes relative to the form of notice. In Dorsett v. State, 144 Okla. 33, 289 P. 298, this court, in considering the question of the service of such a notice, and discussing the purpose of same, uses the following language:

"* * * The purpose of this notice is to challenge the attention of the officer or officers to an irregularity of expenditure to an illegal or fraudulent contract or dispersement of public moneys before suit is brought against them by a taxpayer. * * *"

And further in the opinion the following language is used:

"And, further, all the things by statute required to be in the demand were therein contained, and, should it contain surplusage, the notice or demand is not by reason thereof destroyed and invalidated. * * *"

The notice in this case was clearly sufficient to serve the purpose and object of the giving of such a notice. It gave the interested and necessary parties full information as to those things about which the taxpayers complained. There is no showing here from which it might be concluded or inferred that the defendants in this case did not fully understand the nature of the demand made by the taxpayers, nor any showing or indication that they have in any way been prejudiced by reason of the form of the demand. We, therefore, conclude that such notice and demand was sufficient.

A notice in such a case must never be so indefinite as to mislead and snare or trap an officer; to that end it must fairly advise the officer of the action demanded of him in order that he may institute the action demanded by the taxpayer if he chooses. Upon the other hand, the officer upon whom a notice has been served, and who neglects or fails to act upon the matter, may not escape liability merely because he can indicate in the notice some incompleteness of detail, or some inaccuracy which is purely technical. Fairness and justice require that such a notice be sufficient in form and substance to serve the office and purpose of such a notice, but no more is required, and when that requirement is met, fairness and justice require that the notice be held legally sufficient. When tested by these rules the notice here is sufficient. See paragraph 6

of the syllabus in State ex rel. Sheel v. Ingram, 164 Okla. 244, 23 P. (2d) 648.

We next consider defendants' proposition 3 as follows:

"The plaintiff had no right to institute or maintain the action because no proper security for cost was given as required by statute."

They again call our attention to section 8591, supra, and the decisions to the effect that the plaintiff is held to a strict compliance therewith. They refer particularly to that portion of the statute which provides:

"* * * After serving the notice aforesaid and after giving security for cost, may, in the name of the state of Oklahoma as plaintiff, institute and maintain any proper action. * * *"

The facts on this point are that the plaintiff deposited $10 upon commencing suit and the further sum of $200 some two weeks later. Ten months later, during the trial, the defendants for the first time sought dismissal of the action on account of alleged improper security of the costs. Thereupon plaintiff executed bond for costs in proper form, and in addition thereto deposited the further sum of $250 in cash. At that time there remained in the hands of the clerk some $96 of the former cost deposit which had not yet been exhausted by cost charges. On that day the trial court overruled defendants' motion to dismiss, apparently taking the view that all costs in the case were and had at all times been amply secured by plaintiff. There appears no serious contention that the cost bond filed was in any manner insufficient or that the aggregate cash deposit of $460 was insufficient to cover all court costs.

The defendants' position is that giving security for costs must be interpreted as giving bond for costs, and they suggest that the court acquires no jurisdiction of the cause until this is first done. We have carefully considered defendants' lengthy argument in this respect, and have examined the authorities cited, and conclude that such provision contained in section 8591, supra, is merely for the purpose of making it clear that, although the plaintiff was permitted to sue in the name of the state of Oklahoma, he shall not be permitted to do so cost free, or at the expense of the state, but must do so at his own costs in the first instance. The argument is advanced that this being a special law, and a penal statute, it is an exception to the general costs statute, the same being section 764, C. O. S. 1921, now found

under chap. 2, art. 20, O. S. 1931 (sec. 511). We find no conflict in the two provisions of the law. Section 764, supra, provides the method by which the costs in civil actions may be paid or secured, and it is shown beyond question in this case that the plaintiff complied therewith in every particular. Under the general costs statute above noted, a deposit for costs or the giving of cost bond is not a jurisdictional prerequisite to instituting or maintaining an action. Fowler v. Fowler, 15 Okla. 529, 82 P. 923. Section 8591, supra, in so far as it provides for the plaintiff's giving security for costs, is completely satisfied when the plaintiff has complied with the general cost statute found as section 764, supra, and there is no conflict in the two sections of the law. The primary object in both of the statutes is to provide for the payment of costs, and by whom it shall be paid, and this object has unquestionably been accomplished in the instant case.

In 15 C. J. 214, the text discusses security for costs and cash deposit for costs and states this general rule:

"And if the kind of security is not designated by statute, a deposit of money may be given by way of security."

We conclude that under the facts shown the trial court did not err in this conclusion.

Defendants' proposition 4 is as follows:

"The trial court erred in refusing to require plaintiff to separately state and number the eight causes of action constituted by the eight wrongful payments set out in plaintiff's petition as one cause of action."

It is plaintiff's theory in this case that the suit is based only upon one cause of action, to wit, that the defendants proceeded throughout the entire matter with the intention on the part of one of the defendants to buy the 160 acres of land which was actually transferred, although the transfer of the property and the payments therefor were completed at different times, and that the various deeds, claims, and payments constitute but parts of the general agreement and intention to buy and sell this particular tract of land. The trial court so considered the matter and proceeded upon this theory in the trial of the cause. The facts as disclosed by the record substantially support this conclusion. In Henry v. Gulf Coast Drilling Co., 56 Okla. 604, 156 P. 321, it is said:

"The motion to separately state and number is a matter largely in the sound discretion of the court. Of course, this discretion ought not and must not be an arbitrary one, and, if it appears that in the same count

distinct and disconnected causes of action are pleaded, so as to embarrass the pleader in demurring or further pleading, then such a motion which comes within the rule should be sustained, and to refuse the same would be reversible error."

And in Griffin Grocery Co. v. Scroggins, 145 Okla. 9, 293 P. 235, it is said:

"A motion to make petition more definite and certain is addressed to the sound discretion of the court, and a ruling thereon, in the absence of an abuse of such discretion that results prejudicially to the party complaining, will not be disturbed."

It is nowhere shown that the defendants here were in any way embarrassed in their pleadings, nor in the trial, nor is it pointed out wherein the form of plaintiff's petition has prejudiced the defendants in their defense in any manner. There being no indication of any prejudice, we cannot say the trial court erred in this ruling.

Defendants' proposition 5 would require a construction of the city charter as to what extent it applies to real estate, and to what extent to personal property. It is unnecessary to determine that matter, on account of the conclusion we have reached in the case as a whole, and as to defendants' proposition 7, which is later discussed.

Defendants' proposition 6 is stated as follows:

"The defendant commissioners had a right to purchase this real estate for a public park and to devote a reasonable portion thereof to an airport and aviation field."

In the abstract the right of a city, through its commissioners, to purchase land for park and airport purposes appears to be determined in accordance with defendants' contention in Schmoldt v. City of Oklahoma City, 144 Okla. 208, 291 P. 119, and the same seems to be practically conceded by the plaintiff. However, the right to purchase property for city use as an abstract proposition may have but little to do with the question whether any specific property was or was not purchased by a lawful and authorized expenditure of public funds. The vital question in this case is whether there was any unauthorized or unlawful expenditure of public funds.

We now consider defendants' proposition 7, which is as follows:

"This property having been purchased from the profits from the municipally-owned light and water plant and not from taxes, it was not necessary that an estimate be made by the city commissioners or an appropriation by the excise board of Kay County, Okla."

The evidence in this case shows, without contradiction, that all of the warrants, totaling $31,400, issued to the defendant Dowler in payment of the real estate here, were general fund warrants, and that each of said warrants was paid from the general governmental fund of the city of Blackwell (the fund was so designated by one of the city officials in his testimony). Some of these warrants were paid out of general governmental funds for the fiscal year 1927-1928, and some of them were paid out of general governmental funds for the fiscal year 1928-1929. The record shows further, without contradiction, that the excise board of Kay county made no appropriation whatever for the purchase of land for park or airport purposes during either of such fiscal years, nor is there any appropriation made by the excise board for either of said fiscal years for any purpose which could be construed as in any way intended for the purchase of real estate by such city under any department of the city government. The record here conclusively shows, and it is not contended otherwise by the parties, that these lands were purchased for public park and airport purposes. The applicable laws relative to appropriations of public funds of a municipality are as follows:

Section 12674, O. S. 1931:

"Each board of county commissioners, the mayor and council of each city, or the officers exercising like power in any city having a charter form of government, the board of trustees of each incorporated town, the directors of each township and the board of education of each independent school district shall meet on the first Monday in July of each year, and the directors of each school district shall meet on the second Tuesday in July of each year, and shall, respectively, make in writing a financial statement showing the true fiscal condition of their respective municipalities as of the close of the previous year, and an itemized statement of estimated needs and probable income from sources other than ad valorem tax of each thereof for current expense for the current fiscal year. The financial statement shall be supported by schedules or exhibits showing by classes the amount of all receipts and disbursements, and shall be sworn to as being true and correct. The statement of estimated needs shall be itemized so as to show by classes, first, the several amounts necessary for the current expenses of the municipality, and each officer and department thereof. Second, the amount required by law, to be provided for sinking fund purposes: third, the probable income that will be received from all sources other than ad valorem taxes, and shall be detailed in form and amounts so as to disclose the several items for which the excise board is authorized and required in section 5 hereof (12677) to approve estimates and make appropriations. Each financial statement and estimate for county, city, incorporated town, township and board of education, as prepared in accordance with the provisions of this section shall be published in some newspaper published in said municipality in one issue, if published in weekly newspaper, and in two consecutive issues if published in daily; and if there be no paper published in each county, city, incorporated town, or township, then a copy of such statement and estimate shall be posted in at least five public places therein, which posting shall be made in each instance within five days after the meeting of said municipal board; said publication or posting shall be made in each instance by the board of authority making the estimate. Said estimates so made out and published as aforesaid shall, as soon as completed, be certified to the excise board of the county, together with an affidavit attached, showing the publication or posting thereof, as required by this act. The estimates and statements provided for in section 4 (12676) shall also at the same time be transmitted to the excise board."

Section 12676, O. S. 1931:

"Each officer, board or commission of any county, city, township and school districts or town, and all employees charged with the management or control, of any department or institution of either thereof, shall on or before the first Monday in July of each year, make and file with the board or commission charged with the duty of reporting to the excise board, a report in writing showing, by classes, the earnings and cost of maintaining their respective offices or departments for the previous fiscal year, together with an itemized statement and estimate of the probable need thereof for the current or ensuing fiscal year. Provided, that the report relative to the construction and repair of bridges shall be made by the county commissioners and county surveyors, conjointly, and shall be itemized so as to show the location of each proposed new bridge and the estimated cost thereof, and provided. further, that the report relative to the probable needs of the courts of record shall be made by the court clerk and county attorney, conjointly, and shall be itemized so as to show separately the respective needs of each court."

Section 12677, O. S. 1931:

"The excise board shall meet at the county seat on the last Saturday of July, and may adjourn from day to day and time to time thereafter, for the purpose of examining the financial statements for the previous fiscal year as submitted by the county and

the several cities, towns, townships and school districts, and ascertaining the true fiscal condition of each thereof at the close of such year; and for the further purpose of examining the statements of estimated needs for current expense purposes for the current fiscal year as certified by each of said municipalities, and determining the items and amounts for which appropriations shall be made for such year detailed as to each officer, board or department. The said board shall have power and authority to revise and correct any estimate certified to them by either striking items therefrom, increasing, or decreasing items thereof, or adding items thereto, when in its opinion the needs of the municipality shall require. All revisions and corrections shall be as to specific items of the estimate, and in no event shall any item or items of the estimate for current expense purposes be increased, or any item added thereto, until such proposed increase or additional item shall have been advertised and published by the excise board in some newspaper of general circulation in the county, in one issue, if published in a weekly paper, and two consecutive issues, if published in a daily paper. The cost of any such publication shall be paid by the municipality. When the excise board shall have examined, revised and adjusted the items of the respective estimates of the several municipalities, and shall have ascertained in separate items the needs of each, if the same shall be within the limits for current expenses as provided by law, they shall approve the said items and appropriate the respective amounts thereof for the purposes so found to be necessary. The appropriations made for the use of each separate office, board, commission. or department of the several municipalities, shall be stated in separate items, and no appropriation shall be available for the use of more than one office, board, commission or department. * * *

"The appropriations for city and towns shall be itemized so as to show the amount of funds appropriated for the several offices, boards, commissions and departments and shall be detailed in separate items as to each thereof, as follows: for salaries and compensations of each officer and all regular deputies employees thereunder; for special services and extra help; for office supplies, blank books, stationery and printing; for postage, telephone and telegraph; for express, freight, and drayage; for light, fuel and water; for rent; for charities and aid to poor; for furniture and office equipment, for maintenance, renewals and extensions: for purchase of park, building sites, and other real estate, with appropriation for each, separately stated; for construction of new buildings, with the appropriation for each proposed building, separately stated; for maintenance and repairs on buildings and parks; for park and other permanent improvements with the appropriation for each, separately stated; for equipment and apparatus; for such other expenditures as may be necessary and authorized by statute or ordinance, but not herein enumerated. * * *

"Such appropriations as to counties, cities, towns, townships and school districts may be further detailed and itemized at the discretion of said excise board, and the said board shall have the authority to impose and prescribe such additional restrictions as to the expenditure of any item of appropriation as it may deem meet and proper."

Section 12678, O. S. 1931:

"When the excise board shall have ascertained the total assessed valuation of the property taxed ad valorem in the county and in each municipal subdivision thereof and shall have computed the total of the several items of appropriations for current expense and sinking fund purposes for the county and each municipal subdivision thereof with ten per cent. (10%) added thereto for delinquent tax, they shall thereupon make the levies therefor, after deducting from the total so computed the amount of any surplus balance of revenue or levy, ascertained to be on hand from the previous fiscal year or years, together with the amount of the probable income of each from all sources other than ad valorem taxation, provided, that in no event shall the amount of such estimated income exceed the actual collections from such source for the previous fiscal year. The rates of levy for current expense purposes and sinking fund purposes shall be separately made and stated and the revenue accruing therefrom shall be known as the general fund and sinking fund, respectively; and when so made, be certified to the officer whose duty it is to make up the tax rolls. The secretary of the excise board shall immediately certify the appropriation so made by the excise board to the clerk or other issuing office of the municipality for which the same is made. The several items of the estimate as made and approved by the excise board for each fiscal year shall constitute and are hereby declared to be an appropriation of funds for the several and specific purposes named in such estimate, and the appropriations thus made shall not be used for any other fiscal year or purpose whatsoever. Each clerk or other issuing officer shall open and keep an account with the amount of each item of appropriation showing the purpose for which the same is appropriated and the date, number and amount of each warrant drawn thereon. No warrant or certificate of indebtedness in any form, shall be issued, approved, signed, attested or registered on or against any appropriation for a purpose other than for which the said appropriation was made, or in excess of the amount thereof."

Section 12681, O. S. 1931:

"The term 'appropriation' as used herein is hereby declared to be synonymous with 'estimate made and approved,' as defined in section 3, chapter 80, Session Laws, 1911 (5950) and the provisions, requirements, limitations and penalty of said chapter 80, Session Laws 1911, are hereby specifically declared to extend to and embrace 'appropriations' as herein defined."

Section 12682, O. S. 1931:

"Each and every warrant or certificate of indebtedness must be drawn against a specific appropriation or a specific amount authorized by a bond issue for such purpose. As soon as said warrant, certificate of indebtedness or a bond is issued, the same shall be at once signed and attested and forthwith delivered by the officer attesting the same to the treasurer of the county or subdivision thereof, issuing the same for registration."

Section 5948, O. S. 1931:

"All public funds of any county or of any subdivision thereof shall be disbursed only in the payment of legal warrants, bonds and interest coupons."

Section 5949, O. S. 1931:

"It is hereby made the duty of every officer authorized to allow, issue, draw or attest any warrant or certificate of indebtedness against the public funds of any county, city, town, township, board of education, school district or any other subdivision of the county; to issue, draw and record all warrants, bonds and interest coupons, in the numerical order issued on each fund, beginning with number one and issuing the same consecutively during the fiscal year. At the beginning of each fiscal year a new series shall be commenced, and said series shall be designated by writing the fiscal year on the warrant or certificate of indebtedness for which the levy to pay the same has been made."

Section 5950, O. S. 1931;

"The term 'estimate made and approved' as used herein, is defined to mean the itemized statement of the estimated needs of a municipality for its current expenses for the ensuing fiscal year, as approved and fixed by the excise board or by vote of the municipality, adding thereto the amount necessary to create a sinking fund to meet maturing bonds, judgments and interest coupons, but the amount or limit to which warrants and certificates of indebtedness may be issued, shall not include the ten per cent. to be added to the estimate for delinquent taxes."

Section 5953, O. S. 1931:

"It shall be unlawful for any officer to issue, approve, sign, attest or register any warrant or certificate of indebtedness in any form in excess of the estimate of expenses made and approved for the current fiscal year or authorized for such a purpose by a bond issue, and any such warrant or certificate of indebtedness issued, approved, attested or registered in excess of the estimate made and approved or authorized by a bond issue, shall not be a charge against the municipality upon which it is issued, but may be collected by civil action from any officer issuing, drawing, approving, signing, attesting, registering or paying the same, or from either or all of them, or from their bondsmen."

Section 5955, O. S. 1931:

"It shall be unlawful for the board of county commissioners, the city council or the commissioners of any city, the trustees of any town, board of education, township board, school district board or any member or members of the aforesaid commissioners, or of any of the above-named boards, to make any contract for, incur, acknowledge, approve, allow or authorize any indebtedness against their respective municipality, or authorize it to be done by others, in excess of the estimate made and approved by the excise board for such purpose for such current fiscal year, or in excess of the specific amount authorized for such purpose by a bond issue. Any such indebtedness contracted, incurred, acknowledged, approved, allowed or authorized in excess of the estimate made and approved for such purpose for such current fiscal year or in excess of the specific amount authorized for such purpose by a bond issue, shall not be a charge against the municipality whose officer or officers contracted, incurred, acknowledged, approved, allowed or authorized or attested the evidence of said indebtedness, but may be collected by civil action from any official contracting, incurring, acknowledging, approving or authorizing or attesting such indebtedness, or from his bondsmen."

The record discloses, without doubt, that all of the acts in the matter of paying the defendant Dowler for the land purchased were done at the instance and in pursuance of specific authority and direction of the defendants here, who constituted the city commissioners of the city of Blackwell. It appears, further, that the issuing of the warrants against the general fund of said city and the payment of the same out of such fund is in direct violation of the provions of the applicable statutes above quoted, for the obvious reason that they exceed the appropriation for the fiscal years under consideration, there having been no appropriation for this purpose during such years. These statutes have been construed many

times by this court, one of the early cases being Shannon v. State ex rel. Davidson, 33 Okla. 293, 125 P. 1106, which discusses the inhibitions contained in the law against issuing a warrant in excess of appropriations. This decision is clear and concise in its language and specifically points out that the statute means what it says, to wit: "That a warrant cannot be drawn against a fund in excess of the appropriation." Other cases to the same effect are noted as follows: State ex rel. Decker v. Standfield, 34 Okla. 524, 126 P. 239; Haskins & Sells v. Oklahoma City, 36 Okla. 57, 126 P. 204; Carey, Lombard, Young & Co. v. Hamm, 61 Okla. 174, 160 P. 878; Comstock v. City of Commerce, 100 Okla. 302, 229 P. 167; Wilson v. Oklahoma City, 120 Okla. 266, 251 P. 484; Boardman Co. v. Board of Com'rs of Ellis County, 136 Okla. 85, 276 P. 474; Blake, County Treas., v. Abraham, 149 Okla. 112, 299 P. 488; Myers v. Independent School District, Consol. No. 1, Comanche County, 104 Okla. 51, 230 P. 498; State ex rel. Awtrey v. Randolph, 139 Okla. 254, 281 P. 956. There are many other decisions of this court dealing with this question, all of which support the rule that a municipal general fund warrant may not be issued or paid except by authority of an appropriation by the excise board and within the limits thereof. No authority is given for the issuance or payment of such warrant except by the general revenue laws of the state.

The defendants seek to excuse the issuance of these warrants and the payment of same from the general fund of said city by attempting to show that the money used in payment of said warrants was derived from the operation of its municipally-owned water and light plant. In view of section 5 of our statutes above quoted, and of the language of the court so plainly expressed in Shannon v. State ex rel. Davidson, supra, and the numerous other decisions of this court to the same effect, it appears hardly worth while for the court in this opinion to point out the inapplicability of the decisions of this court relating to funds derived from the operation of a municipally-owned utility. For, as pointed out in the Shannon Case, supra, it matters not the condition of a fund so far as collections or cash on hand is concerned, nor from what source the money is derived. In the issuance of a general fund warrant such as we have here, the authorities who caused the issuance and payment thereof must look to the condition of the specific account as appropriated by the excise board. The

court used the following language in the Shannon Case, supra:

"The excise board may consider at such time the balance to the credit of any fund in the county treasury, for the purpose of determining the amount of taxes necessary to be levied; but when the board of county commissioners is called upon to approve or allow any claim against any fund of the county, or any officer, whose duty it is to issue a warrant when such a claim is allowed, is called upon to issue such warrant, they may look only to the estimate made and approved by the excise board, and to the amount of claims allowed or warrants already issued thereunder during such fiscal year, to determine whether they are authorized to approve the claim, or to issue a warrant therefor."

Defendants say that at some time, either before or after the issuance and payment of the warrants, they caused certain "profits" derived from the operation of the city waterworks and light plant to be transferred to the general fund for the purpose of paying these warrants. Assuming that they had such "profits," and assuming that they had authority to transfer the same to the general fund, and assuming that when so transferred this became a part of the cash assets of the general fund, their position is still unaltered as disclosed by the Shannon Case, supra.

In view of the facts here, it is difficult to understand this contention as to the "transfer into the general fund" of money received from operation of the water department. This money was already in the general fund, just the same as money received from fines, interest on daily balance, and miscellaneous receipts, as shown by the annual financial statement and estimated needs of the city. This is shown of record in this case by copy thereof. The city's annual estimate of income from sources other than ad valorem taxation included an estimate of the total or gross receipts of the water department for the fiscal year, just as it included an estimate of the receipts from fines and miscellaneous receipts, and interest on daily balances and other estimated income. All this was properly shown as required by section 12674, supra. These estimates were based on actual receipts of the prior year, and an estimate of anticipated revenue of the ensuing year. Those estimates were approved pursuant to sections 12677 and 12678, supra. When those estimated receipts were in fact received in money, that money at once entered and became a part of the general fund of the city, and needed no transfer thereto.

The eight warrants involved are all shown in the record. They appear to be drawn on the general fund of the city, as any other warrants for the general expenses of the city. Each is marked "General Fund" and in addition thereto, contains these words, "out of the General Fund of the City." No reference is made to the water department nor to any other department of the city. The warrants in no manner purport to be drawn on any special fund of the city. They were in fact drawn on the general fund of the city and were paid therefrom.

It appears to be contended by defendants that, even though such warrants were so drawn and so paid, and without any appropriation therefor, or estimate made and approved therefor, nevertheless said warrants were legally issued and paid because more than enough money to pay these warrants and pay the expenses of the light and water department went into the general fund from light and water income.

Such contention is wholly untenable (under the facts in this case) in view of the statutory plan in this state to make expenditures from the general fund of a municipality only within an appropriation or estimate made and approved for the particular purpose.

To sustain the contention here made by the defendants would establish the rule that expenditures in excess of appropriations, or in the absence of appropriations, might be made in practically any department of the city, so long as money from some source came into the general fund in sufficient sum to pay the warrants, and so long as the purpose of the expenditure was a legitimate one. It may be true here that the city general fund actually received sufficient moneys from various sources, including light and water income, to pay these eight warrants and all others issued and drawn on the general fund. Such fact, if true, could not aid defendants here. These warrants were drawn and paid illegally and without authority because no appropriation was made for park or airport purposes. Appropriations were made, and properly so, for the expenses of the water department and the electric plant, and all other departments of the city. If more money came into the general fund than was needed to meet the appropriations or warrants necessarily and legally drawn, then a surplus might exist. In the case of a surplus the law makes ample provision for supplemental appropriations. (Section 12680, O. S. 1931.)

Such surplus, however, must be preserved and kept on hand unless it be supplementally appropriated according to law and expended in keeping therewith, and it may not be expended without an appropriation, however honest the officers may be, and however desirable may be the purpose of the unauthorized expenditure.

The defendants cite no authority supporting their right to issue and pay these warrants in the absence of an appropriation, and no authority examined by us is persuasive that these contentions of the defendants are sustainable.

Defendants' contention that the unauthorized expenditure of these public funds of the city of Blackwell had been ratified and confirmed by the people of the city of Blackwell, as incorporated in their proposition 8, is not well taken. They suggest that the city received the real estate involved and used and occupied the same for park and airport purposes, and are continuing to so use the same, and that by a majority vote the people authorized the expenditure of $25,000 of public funds in the improvements thereof. A vote by the people on the question of expenditure of funds in the improvement of the real estate falls far short of evidencing a desire on the part of the people to approve an unlawful expenditure of funds in the purchase thereof. Such vote on such question does not indicate in any way that the people voting thereon had knowledge of the unlawful expenditure of public funds in the purchase of the land, nor is there anything to indicate therefrom that any question relating to the purchase of the land and the payment therefor was in any way involved in an election upon the question of improving such real estate. Even if the facts relating to this point did reveal an actual intent and effort on the part of the voters to ratify the unlawful issuance of the warrants here, still the defendants' position on this point could not be sustained, as is pointed out in Re Town of Afton, 43 Okla. 720, 144 P. 184, and Haskins & Sells v. Oklahoma City, supra. Acts of public officials in direct violation of the provisions of the law limiting the issuance of warrants cannot be ratified in such manner as herein contended by defendants. The Constitution and statute laws lay down an absolute bar to the issuance of warrants and to the expenditure of public funds in the manner shown herein.

In considering defendants' proposition 9 to the effect that

"The court erred in sustaining plaintiff's demurrer to that portion of the defendants' answer which pleaded the validating act of the Legislature"

—we have had our attention called to section 1, chapter 238, S. L. 1929, which provides as follows:

"All contracts, deeds, leases, right of ways and proceedings of any city of this state which shall have heretofore acquired or attempted to acquire sites for aviation airport or airports, either within or without the corporate limits of such city, and all proceedings of such cities and of the officers thereof, had for the purchasing or acquiring of the same are hereby legalized, and validated, in so far as the lack of authority of such city to enter into any such contract, deed, lease or right of way existed."

This act in no sense purports to validate and legalize any expenditures of public funds for airport purposes which were unauthorized and illegal because of the absence or lack of any appropriation or estimate made and approved. The effect of the act is specifically limited to "validating" only "in so far as the lack of authority of such city" existed. It was only a few weeks prior to the passage of this act that specific legislative authority had been granted to any city to own or control an airport. See Session Laws 1929, chap. 11, sec. 1 (section 6350, O. S. 1931). Prior to that time it was seriously questioned whether or not a city had the right to own and operate an airport, no matter how otherwise legally the money had been appropriated and expended to purchase the land. Cities in the state had, in fact, theretofore purchased land and established airports (it is to be presumed that at least most of them had proceeded legally and in the authorized manner in the expenditure of any public funds therefor), and it is clear that the purpose of this act above quoted was to legalize as to lack of authority only, and not as to illegality of expenditure of funds by reason of lack of appropriation. It is also worthy of note that this validating act of the Legislature became effective in July, 1929, and if entitled to the construction urged by defendants, could not affect plaintiff's cause of action in this suit, which had already been commenced and was then pending in the district court of Kay county.

Section 52, art. 5, of the Constitution provides as follows:

"The Legislature shall have no power to revive any right or remedy which may have become barred by lapse of time, or by any statute of this state. After suit has been commenced on any cause of action, the Legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit."

We have considered defendants' contention that this section of the Constitution does not apply to causes arising and prosecuted under a penalty statute. The authorities cited by defendants in support of their contention in this regard either do not deal with cases upon which suit had actually been brought, or such cases as do come within that category are from jurisdictions which do not have the same constitutional provisions as section 52, article 5, of our Constitution.

Our conclusion in this regard is in harmony with the previous decisions of this court in Dolezal v. Bostick, 41 Okla. 743, 139 P. 964; Lusk v. Starkey, County Treas., 53 Okla. 794, 158 P. 918; Rogers, County Treas., v. Bass & Harbour Co., 64 Okla. 321, 168 P. 212; A., T. & S. F. R. Co. v. Eldridge, 67 Okla. 110, 169 P. 1071; Harris v. Boggess, 113 Okla. 60, 238 P. 477; Union School District No. 1 Kay County, v. Foster Lbr. Co., 142 Okla. 260, 286 P. 774; Meriwether v. Board of Co. Com'rs, Comanche County, 150 Okla. 223, 1 P. (2d) 390; Reed v. Marr, 153 Okla. 85, 5 P. (2d) 135.

The defendant Dowler has filed a separate brief in which he urges error of the court in refusing to sustain his separate demurrer to the evidence, and in overruling his separate motion for an instructed verdict.

The applicable rules of law as applied to defendants other than public officials in an action brought under sections 8590 and 8591, supra, is announced by this court in Buckeye Engine Co. v. City of Cherokee, 54 Okla. 509, 153 P. 1166. Sections 2, 3, and 4 of the syllabus therein are as follows:

"In an action for a statutory penalty, the burden is on the plaintiff to prove all facts necessary to bring the case under the provisions of the statute.

"In an action for the penalty imposed by section 6777, Rev. Laws 1910, against one not an officer of the municipality, the burden is on the plaintiff to show that the party receiving the money had notice that the contract under which it was paid was unlawful, fraudulent, or void.

"In an action by a creditor of a municipal corporation, the burden is on him to show that all provisions of the law were complied with before his contract was entered into, and it is not material that he had no notice of the failure to comply with the statutes, but an action for a penalty under

section 6777, Rev. Laws 1910, cannot be sustained, unless the defendant had notice of the vice in the contract under which the money is paid."

The liability in this case attaches by reason of the purchase of real estate, the approval of claims therefor, and the issuance of general fund warrants in excess of the appropriations made and approved by the excise board of Kay county. The record here contains no testimony to the effect that the defendant Dowler knew that the contract of purchase, the allowance of the claims, or issuance of the warrants were in excess of appropriations made for that purpose, or that no appropriation whatever had been made therefor.

Our attention has been called to State ex rel. Hatfield v. Moreland, 152 Okla. 37, 3 P. (2d) 803, wherein the parties had filed claims against Woods county for a refund of taxes paid, and the same were allowed and warrants issued and paid out of the general fund of said county. The court in the Moreland Case, supra, held that such defendants were liable by reason of the fact that they were charged with knowledge of the law that tax refunds could not be paid out of a county general fund and county general fund warrant issued therefor. In the instant case the law did not specifically prohibit the city of Blackwell from purchasing real estate for park and airport purposes. Had it done so, this case would be similar to the Moreland Case on that point. The two cases harmonize and are striking illustrations of the distinction between knowledge of the facts and knowledge of the law. The Buckeye Engine Co. Case, supra, is applicable here for the reason that whether or not a general fund appropriation had been made by the excise board of Kay county for the purpose of the purchase of this land was a question of fact as distinguished from a question of law, and it was necessary to prove knowledge of such lack of appropriations on the part of Dowler in order to hold him liable under the provisions of the law relied upon.

The judgment is affirmed as to the defendants H. M. Lively, Max M. Fife, and A. L. Hess. As to the defendant H. M. Dowler, the judgment of the trial court is set aside and judgment is hereby reversed in favor of the defendant H. M. Dowler.

BAYLESS, V. C. J., and RILEY, PHELPS, and CORN, JJ., concur. OSBORN, C. J.. and BUSBY, GIBSON, and HURST, JJ., dissent.