Dear Superintendent, Sandy Garrett,
¶ 0 The Attorney General has received your letter asking for an official opinion addressing, in effect, the following questions:
1. For what purposes may a school district issue a certificateof indebtedness? May a district issue a certificate ofindebtedness for the purpose of reinvesting the proceeds togenerate additional investment revenue?
 2. If a school district issues a certificate of indebtedness,is it an encumbrance which must be deducted from the authorizedappropriation of the district?
 3. How may the proceeds of a certificate of indebtednessissued by a school district be invested?
 4. What are the potential consequences if a school districtthrough the issuance of a certificate of indebtedness, or byother means, incurs an obligation in excess of its appropriationfor the fiscal year in which the obligation is issued?
 I.
¶ 1 Each of your questions relates to the use of certificates of indebtedness by school districts. However, before turning to these issues, we must first review the nature and function of certificates of indebtedness, as well as their place within the framework of Oklahoma's statutory law.
A. Certificates of Indebtedness.
¶ 2 The term "certificates of indebtedness" has long been a fixture of Oklahoma's statutory law. See e.g. 5953, O.S. 1931; 12678, O.S. 1931; 12682, O.S. 1931. However, the term is not defined by any Oklahoma statute, nor has its meaning been adjudicated in any reported decision of an Oklahoma court. Further, it appears that prior to 1987 the certificates had been used little, if at all.
¶ 3 But in 1987, the Legislature gave greater substance to the term "certificates of indebtedness" through the enactment of what is now codified as 70 O.S. 5-136.1 (1990). That statute authorizes and outlines the use of certificates of indebtedness in such a manner that we may discern the intent of the Legislature as to the nature of the instruments from an examination of the statute. 70 O.S. 5-136.1 provides as follows:
 With respect to school districts seeking cost recovery, interim or alternative means of funding during any fiscal year, any such school district may issue and deliver certificates of indebtedness bearing a stated maturity date to fund the estimated costs of operations, capital expenditures or other lawful costs of the school district for the current fiscal year. The certificates of indebtedness shall be issued, delivered and registered for payment in the manner and under the authority set forth for school district warrants; provided, any such certificates of indebtedness may be made payable on any date within the then current fiscal year and may be purchased for value through the funding of uncollateralized investments made for the benefit of and on behalf of the school district. Interim financing and cost recovery programs established for the benefit of any school district may lawfully provide for the investment of note or bond proceeds by the issuer of the obligations with the benefit and use of such proceeds assured to the school district if, as and when needed by the school district. In no case may certificates of indebtedness be issued, delivered and made payable on a date extending beyond the then current fiscal year, and any such certificates of indebtedness shall be within the estimates and appropriations approved and certified by the County Excise Board in accordance with 68 O.S. 2499 of the Oklahoma Statutes. This provision further broadens and expands upon the statutes pertaining to issuance of certificates of indebtedness and payable and nonpayable warrants within any fiscal year and those provisions dealing with the use and investment of funds provided for the use and benefit of school districts electing to participate in the above mentioned programs.
¶ 4 A close reading of 70 O.S. 5-136.1 reveals that the statute addresses three distinct areas. The statute (1) authorizes the issuance of certain instruments, denominated "certificates of indebtedness"; (2) makes provisions relating to the disposition of the instruments; and (3) establishes a procedure through which the issuance of the instruments will be recorded. Id.
¶ 5 70 O.S. 5-136.1 permits school districts which are seeking a cost recovery, interim or alternative means of funding" to issue certificates of indebtedness. The certificates may be issued to fund the estimated costs of the school district for the current fiscal year. 70 O.S. 5-136.1. In addition, the certificates may be made to be payable on a specific date within the current fiscal year; however, the certificates may not be issued, delivered and made payable on a date beyond the current fiscal year. Id. Because of this intra-fiscal year limitation, the certificates must necessarily be repaid from funds accruing to the schools during the year the certificates are issued. Thus,70 O.S. 5-136.1 essentially authorizes school districts to issue debt instruments — similar in nature to short-term notes — in anticipation of revenues to be received during the fiscal year.
¶ 6 70 O.S. 5-136.1 also makes several unusual provisions for the disposition of certificates of indebtedness. The statute specifies that the certificates may be purchased "through the funding of uncollateralized investments" made on behalf of the school districts. Id. 70 O.S. 5-136.1 further permits "interim financing and cost recovery programs" to provide for the investment of proceeds from certificates of indebtedness.
¶ 7 Finally, the statute purports to set forth a procedure by which certificates of indebtedness are to be recorded. The certificates are to be issued, delivered and registered "in the manner and under the authority set forth for school district warrants." Id. Further, the certificates are to be "within the estimates and appropriations approved and certified by the County Excise Board." Id.
¶ 8 Viewed as a whole, it is clear that the primary purpose of70 O.S. 5-136.1 is to permit school districts to obtain short-term financing for the expenses incurred by schools during the fiscal year. The financing is to be secured through the issuance of short-term notes — certificates of indebtedness — in anticipation of the receipt of current fiscal year revenue. The attendant allowances and restrictions of the statute simply provide a means to facilitate the legislative goal of making short-term financing available to school districts in an anticipation of the receipt of current fiscal year revenue.
¶ 9 This ability to obtain short-term financing in anticipation of current revenue may be useful to some districts given that the receipt of school district revenue does not necessarily coincide with the need for school district expenditures.
¶ 10 Incidently, we observe that the mismatch between currently available revenues and desired expenditures is not a problem which is unique to Oklahoma school districts. Many other states recognize this problem and have addressed it by enacting statutes to permit local governmental subdivisions, including school districts, to issue tax anticipation notes. See, e.g. Cal. Gov't Code 53820 et seq. (West 1990); Kan. Stat. Ann. 72-8203b
(1990); La. Rev. Stat. Ann. 17:89 (West 1990); Mo. Rev. Stat.165.131 (1990); N.Y. State Fin. Law 25.00 (McKinney 1990); Ohio Rev. Code Ann. 133.09 (Baldwin 1990); Pa. Stat. Ann. tit. 53, 6780-201 et seq. (Purdon 1990); Wash. Rev. Code 39.50.010 et seq. (1990). In addition, some states have enacted statutes permitting their state governments to issue such instruments. See, e.g.
La. Rev. Stat. Ann. 39:1410.41 et seq. (West 1990); N.Y. State Fin. Law 55 (McKinney 1990); Tex. Gov't Code Ann. 404.121 et seq. (Vernon 1990); Utah Code Ann. 63-60-1 et seq. (1990). Indeed, in the United States in 1990, state governmental subdivisions issued $7.6 billion of such debt; state governments themselves issued $15.8 billion of short-term debt. Public Securities Association,Municipal Market Developments, 5 (Feb. 11, 1991).
B. Nonpayable Warrants.
¶ 11 For Oklahoma school districts, however, the traditional methods of dealing with the mismatch between the need to make expenditures and the availability of funds to pay for those expenditures have been the use of timing measures, such as deferring school district expenditures until sufficient cash is on hand or maintaining a cash surplus carryover from a prior fiscal year, and the use of nonpayable warrants.
¶ 12 A warrant" is the order of a governmental entity to its treasurer to pay money to a designated person out of funds of the entity which are, or may become, available for the specified purpose. County Excise Board v. Gulf Pipe Line Co., 9 P.2d 460,463 (Okla. 1932). Upon pre sentation of a valid warrant, the treasurer is to pay the warrant if there is sufficient cash available; if there is not sufficient cash on hand to redeem the warrant, the treasurer is to mark the warrant "nonpayable." 62O.S. 551, 62 O.S. 552 (1981). See also A.G. Opin. No. 84-039. Nonpayable warrants draw a statutory rate of interest until cash becomes available to redeem the warrants. 62 O.S. 475 (1981).
¶ 13 Thus, nonpayable warrants are essentially legal "insufficient funds" checks which school districts may issue when they do not have sufficient cash to pay current expenses. However, because the warrants pay interest, they are also similar to a short-term loan to the district by the creditor to whom the nonpayable warrant was issued.
C. Differences Between Certificates of Indebtedness andNonpayable Warrants.
¶ 14 Apparently, 70 O.S. 5-136.1 was enacted in an effort to provide an alternative means of obtaining short-term financing other than issuing nonpayable warrants. This perception is supported by the fact that 70 O.S. 5-136.1, for the first time in the law of Oklahoma, differentiates between certificates of indebtedness and warrants.
¶ 15 One of the most striking differences between certificates of indebtedness and nonpayable warrants is that the certificates may be made payable on a specific date. This feature permits school districts to fix a date certain in the future when their obligation will become due and payable. Nonpayable warrants, on the other hand, must be paid when cash becomes available to do so. 62 O.S. 552 (1981).
¶ 16 Another important difference is that certificates of indebtedness, as envisioned by 70 O.S. 5-136.1, do not appear to relate to a specific, underlying contractual obligation for goods or services for the school district. Rather, the certificate itself is the underlying obligation. This contrasts with nonpayable warrants which are issued in recognition of specific debts, such as teacher salaries or the costs of instructional materials, which arise from preexisting contractual obligations of the school district.
¶ 17 In addition, because certificates of indebtedness are not required to be issued for any predetermined amount, districts may estimate their anticipated cash shortfall for the entire year and issue a single, large instrument to cover the total amount. Thus, certificates of indebtedness may permit the implementation of a more orderly system for the payment of creditors in anticipation of revenue as opposed to the "haphazard" issuance of warrants, to be payable or nonpayable depending upon a district's cash position. See Flournoy v. Priest, 486 P.2d 689, 691 (Cal. 1971).
¶ 18 In sum, the specific attributes of certificates of indebtedness make the instruments suitable for managing a school district's cash flow; nonpayable warrants simply permit a district to pay expenses despite a lack of ready cash.
D. Cash Management Programs.
¶ 19 The differences described above — the ability to set a maturity date and the ability to issue a single instrument — also serve to make the certificates susceptible to pooling. That is, the certificates of numerous school districts may be easily aggregated together in a single "pool" of uniform instruments. The ease with which the certificates may be pooled has in turn facilitated the development of cash management programs.
¶ 20 The cash management programs which exist in Oklahoma are generally structured as trusts.[1] To illustrate the operation of a typical cash management trusts, consider the following example. A number of school districts that desire to participate in a cash management program each issue a certificate of indebtedness. The trust, pursuant to 70 O.S. 5-136.1, agrees to purchase the certificates "through the funding of uncollateralized investments" made on behalf of the school districts. The districts do not receive cash proceeds from the issuance of the certificates; rather, each district receives a beneficial interest in the "uncollateralized investments" to be funded by the trust. The certificates of indebtedness are then placed in the trust. Next, the trust issues "certificates of participation," representing undivided interests in the trust, which are sold to outside investors. With the proceeds from the sale of the certificates of participation, the trust funds an uncollateralized investment, such as a guaranteed investment contract. During the course of the fiscal year, the school districts are entitled to draw down cash from the investment contract, as it is needed to pay school district expenses. The districts then repay the money into the investment contract as district revenue becomes available. At the end of the fiscal year, the investment contract is liquidated and the proceeds are applied to the retirement of the certificates of indebtedness.
¶ 21 We note that the cash management programs presently existing in Oklahoma are, to a large extent, designed to enable school districts to take advantage of certain federal tax law provisions. The Internal Revenue Code generally exempts the interest on the obligations of state governmental subdivisions, including school districts, from federal income taxation.26 U.S.C.A. 103 (1991). As tax-exempt instruments, the certificates of indebtedness bear a low rate of interest. Because the proceeds of the certificates are not usually needed for immediate use, they are available for temporary reinvestment. Not surprisingly, these proceeds are often reinvested in investments which bear a higher yield. The spread between these different rates creates incremental arbitrage income for the districts and the programs. While the amount of arbitrage earnings that may be generated as a consequence of the issuance of tax-exempt government obligations is restricted by the Internal Revenue Code and is, in certain cases, subject to rebate, the Code does not entirely prohibit such income. See 26 U.S.C.A. 148 (1991).
 II.
¶ 22 Having reviewed the authority for the issuance of certificates of indebtedness, the nature of the instruments and the manner of their use, we now turn to your specific questions. Your first query regards the purposes for which school districts may issue certificates of indebtedness.
¶ 23 In answering this question, we begin, of course, by examining the language of 70 O.S. 5-136.1 (1990), the state statute which authorizes the issuance of certificates of indebtedness. 70 O.S. 5-136.1 specifically provides that school districts may issue certificates of indebtedness to fund the estimated costs of operations, capital expenditures or other lawful costs of the school district for the current fiscal year." Thus, 70 O.S. 5-136.1 permits school districts to issue certificates of indebtedness for three purposes. The certificates may be issued to finance: (1) the estimated costs of school district operations; (2) capital expenditures of the district; and (3) other lawful costs of the school district. This broad and clear statement of purpose allows school districts to issue certificates of indebtedness to secure short-term financing for almost any aspect of district operations — from payment of teachers' salaries to capital improvement projects.
¶ 24 Conversely, we recognize that which is omitted from the statute's enumeration of the proper purposes for which certificates of indebtedness may be issued. The statute does not list the generation of additional income as an appropriate purpose for issuing certificates of indebtedness. Rather, the focus of the statute is clearly on financing the "costs" incurred through school district operations. Applying the maxim expressiounius est exclusio alterius, which commands that the mention of one thing in a statute implies the exclusion of another, Holbertv. Echeverria, 744 P.2d 960, 965 (Okla. 1987), we conclude that the authorization to issue certificates of indebtedness for the specific purposes of funding the estimated cost of operations, capital expenditures or other lawful costs of the school district, serves to preclude any authority to issue certificates of indebtedness for the purpose of generating additional income revenue.
¶ 25 This is not to say that during the period between the receipt of the proceeds from issuance of the certificates of indebtedness and the date the proceeds are expended, the funds cannot be invested so as to earn interest income. However, such temporary investment must be only incidental or ancillary to the primary purpose of obtaining short term financing to cover the actual and legitimate costs incurred through the operations of school districts.
¶ 26 Our conclusion on this issue corresponds with the currently applicable federal tax law. The Internal Revenue Code provides that the interest on state and local obligations is exempt from federal income tax unless the obligation is an "arbitrage bond." 26 U.S.C.A. 103 (1991). An obligation will be deemed to be an "arbitrage bond" if the issuer of the instrument intentionally uses the proceeds, or any portion of the proceeds, to (1) acquire higher yielding investments, or (2) replace funds which were used to acquire higher yielding investments.26 U.S.C.A. 148(a) (1991). Consequently, if a school district were to issue a certificate of indebtedness for the purpose of generating additional investment income, the certificate could be deemed an arbitrage bond and stripped of its tax-exempt status. This loss of tax exempt status would necessarily negate any opportunity to generate arbitrage income through the reinvestment of certificate proceeds and could give rise to other liability.
¶ 27 Further, we note that temporary reinvestment of the proceeds of certificates of indebtedness, as discussed above, is also in accord with federal tax law. 26 U.S.C.A. 148(c) of the Internal Revenue Code provides an exception which permits, in certain circumstances, the proceeds of state and local obligations to be reinvested in higher yielding investments for a temporary period until the proceeds are needed for the purpose for which the obligation was issued.
¶ 28 In sum, 70 O.S. 5-136.1 authorizes school districts to issue certificates of indebtedness to fund the estimated costs of operations, capital expenditures or other lawful costs of the school district for the current fiscal year. 70 O.S. 5-136.1
does not, however, authorize school districts to issue certificates of indebtedness for the purpose of generating additional investment revenue. Nevertheless, school districts are entitled to temporarily reinvest the proceeds of the certificates until such proceeds are needed for school district expenses.
 III.
¶ 29 In your second question, you ask whether the issuance of a certificate of indebtedness gives rise to an encumbrance which must be deducted from a school district's authorized appropriation. The resolution of this question requires a two-tiered analysis. We must first address the threshold constitutional question of whether the issuance of a certificate of indebtedness creates "debt" within the meaning of Article X, Section 26 of the Oklahoma Constitution. Secondly, we must examine the statutory system through which school district budgets are set and expended, and the place of certificates of indebtedness within this system.
A. Certificates of Indebtedness as "Debt" under Article X,Section 26 of the Oklahoma Constitution.
¶ 30 When a school district issues a certificate of indebtedness, it promises to repay the money it receives from the issuance of the instrument.
¶ 31 Consequently, to the extent that a district commits itself to make such repayment, the certificate represents an obligation of the district. Whether this obligation constitutes a "debt" within the meaning of Article X, 26 and is, therefore, an encumbrance of the district is of primary importance.
¶ 32 Article X, Section 26 of the Oklahoma Constitution provides, in pertinent part, as follows:
 [N]o county, city, town, township, school district, or other political corporation, or subdivision of the state, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year without the assent of three-fifths of the voters thereof[.]
¶ 33 We have already discussed the differences between traditional nonpayable warrants, and the certificates of indebtedness authorized by 70 O.S. 5-136.1. Notwithstanding these differences, both instruments operate to bring about a similar end: they both permit school districts to obtain goods or services, or pay other lawful costs of the school district, prior to the districts' receipt of tax revenue.
¶ 34 Even though the issuance of a nonpayable warrant would appear to create a new and separate obligation of a school district to pay an amount of money at some time in the future, the Oklahoma Supreme Court has steadfastly held that this obligation does not constitute additional debt for purposes of the balanced budget provision of the Constitution. Okla. Const. Article X, Section 26.
¶ 35 For example, shortly after statehood, in Bryan v.Menefee, 95 P. 471 (Okla. 1908), the Court, speaking through Justice Williams, a participant at the Oklahoma Constitutional convention, addressed the subject of warrants. The Court observed that Oklahoma's constitutional debt limitation was taken from the constitutions of North Dakota and South Dakota and noted that opinions from the highest courts of those two states found that warrants drawn against yet to be collected tax revenues, where the proceeds were used to pay the lawful expenses of the government, did not create any additional debt. Id. at 474-5. In accord with these decisions, the Court held that the issuance of warrants does not create "indebtedness" within the meaning of Oklahoma's constitutional prohibition. Id.
¶ 36 Three decades later, in State ex rel. Phillips v.Carter, 99 P.2d 1025 (Okla. 1940), the Court recounted the history of nonpayable warrants and reaffirmed that the issuance of these instruments creates no new debt.
 Issuance of nonpayable warrants has been a part of our State financing system since statehood. The people in adopting our Constitution must be presumed to have been familiar with the method adopted. A large part of the financing in the early days of statehood came from ad valorem taxation. Taxes from this source reached the State's treasury six months after the beginning of the fiscal year, which under the Constitution begins July 1. Consequently it was often necessary to issue nonpayable warrants. . . . [S]uch warrants have never been considered debts within the constitutional provisions invoked here.
* * *
 The rule is the same as to municipalities, including school districts, which after appropriations have regularly been made, are authorized to issue warrants to the full extent of the appropriations, notwithstanding the fact that the revenues provided fail to meet the appropriations, and this under Article X, Section 26, of the Constitution which is more restrictive than the provisions relating to the State. Such non-payable warrants have not been considered debts within the meaning of the Constitution.
99 P.2d at 1028-29 (Citations omitted).
¶ 37 Why then should this same principle not also apply to the issuance of certificates of indebtedness? Perhaps because warrants have traditionally been given in exchange for the delivery of specific goods or services.
¶ 38 When a district issues a nonpayable warrant, the obligation of the district is, in a real sense, changed from an obligation to pay the contract to an obligation to pay the warrant when sufficient revenue becomes available. No new debt is created. As the Supreme Court has recognized in a slightly different context, no additional debt is incurred by a political subdivision when it merely changes the form of such indebtedness." Faught v. City of Sapulpa, 292 P. 15 (Okla. 1930).
¶ 39 In contrast, certificates of indebtedness do not correspond to a specific underlying obligation; they may instead be issued in an indeterminate amount which may reflect the district's total cash deficit. Also, the proceeds of the instruments are not required to be immediately expended on existing obligations of the district; rather, the proceeds may be held until such obligations come due. So unlike the traditional nonpayable warrant method, there is no mere change in the form of the debt. A new obligation is created, the proceeds of which may be set aside to pay other district obligations as they arise.
¶ 40 The Oklahoma Supreme Court has addressed this anew obligation" problem in a series of decisions arising out of cases involving both funding bonds and tax anticipation notes.
¶ 41 In one early case, In re: State Funding Bonds of 1935,Series B, 50 P.2d 226 (Okla. 1935), the Court reviewed the validity of legislation permitting the issuance of certain funding bonds. The bonds were to be used to fund outstanding nonpayable warrants. The legislation at issue provided that the bonds could either be exchanged for the warrants, or sold, with the proceeds of the sale dedicated to the repurchase of the warrants. In approving the "sale" method, the Court remarked:
 [T]he issuance of bonds for the purpose of funding a valid debt does not create a new indebtedness, although they are sold and their proceeds devoted to the discharge of the outstanding debt, rather than exchanged for the evidence of such debt. There is no substantial ground for a distinction between the two methods of issuing funding bonds, where the proceeds of the sale are actually used for the retirement of the outstanding obligations funded.
50 P.2d at 229 (Citations omitted).
¶ 42 However, the Court's approval of the sale provision seemed to turn on the fact that no sale of the funding bonds was effective until the obligation evidenced by the outstanding warrants was extinguished.
 It should be noted that the statute expressly provides that no bonds issued under authority of said Act shall be delivered to the purchaser, or become binding obligations of the state unless, and until, a like amount of the outstanding warrants funded is satisfied and paid. The retirement or payment and cancellation of the warrants funded is to be simultaneous with the delivery of the bonds. Under this plan no new debt is created, but the form of the debt is changed.
50 P.2d at 228-29 (Citations omitted).
¶ 43 The Supreme Court also confronted the anew obligation issue in Schmoldt v. Bolen, 80 P.2d 609 (Okla. 1938), a case involving a tax anticipation" debt. In Schmoldt, the Court considered the constitutional validity of several statutes which authorized the state government to issue a State Treasury Notes," i.e., tax anticipation notes. The proceeds of these notes were to be used to pay the State's warrants. The notes were then to be repaid from revenues accruing during the current fiscal year. The Court rejected the argument that any new debt was created.
 We fail to see how the issuance of notes at a less interest rate than warrants would bear can increase the indebtedness of the state or pledge its faith and credit beyond the point to which such faith and credit are already pledged to discharge the obligation of the warrants. If, as in the funding bond case, bonds do not unlawfully create an indebtedness, when they take up legal warrants, it cannot be said that notes which take up the same sort of warrants will create a new or an increased debt.
80 P.2d at 612-13. Even here, however, the proceeds of the new obligations were used to pay off previously issued warrants. Thus, no new "debt" was created; rather, the nature of the State's existing obligation was merely transformed.[2]
¶ 44 The year after the Schmoldt case, the Supreme Court decided In re: State Treasury Note Indebtedness/Funding Bonds of1939, Series A, 90 P.2d 19 (Okla. 1939). In this case, the Court addressed the issuance of funding bonds which were used to pay off treasury notes like those approved in Schmoldt. Some of the bonds were simply exchanged for the notes; others were sold. The legislation authorizing the funding bonds authorized the State Treasurer to use the proceeds of the bonds that were sold to immediately call in the notes and warrants to be retired. However, the legislation also authorized the Treasurer to place any remaining bond proceeds in a "special trust account" dedicated solely to satisfying any remaining notes and warrants. These proceeds were to be used to pay off the notes which could not immediately be retired over a period of time. In upholding the legality of the new bond issue, the Court stated:
 In computing the indebtedness of municipalities in connection with the provisions of Article X, Section 26, Oklahoma Constitution, this Court has held in a number of cases that cash in the sinking fund may be deducted from the outstanding bonds in determining whether a proposed bond issue would exceed the debt limit imposed by said section.
90 P.2d at 26 (Citations omitted).
¶ 45 In approving of these funding bonds, the Court essentially adopted the view that the actual "debt" of the State was the net debt, i.e., the actual obligations of the State less funds on hand set aside exclusively to pay other previous lawful obligations of the State. Thus, the Court departed from earlier cases which evaluated bond legislation on the basis of whether there was an immediate transformation or cancellation of the old debt.[3]
¶ 46 The issuance of a certificate of indebtedness pursuant to70 O.S. 5-136.1 will be subject to this "net debt" analysis. Accordingly, if the proceeds of a certificate of indebtedness are set aside for the sole purpose of paying the other lawful obligations of the school district, then no new "debt," within the meaning of Article X, Section 26 of the Oklahoma Constitution, is created. Conversely, to the extent that the proceeds of a certificate of indebtedness are not dedicated to satisfying the collateral obligations of a district, the issuance of the certificate may result in the creation of new "debt," within the meaning of Article X, Section 26 of the Constitution, which would be unlawful absent a prior vote of the people. Because 70 O.S. 5-136.1 does not specifically address this concern, whether the issuance of a certificate of indebtedness gives rise to new "debt" will be dependent upon the varying factual circumstances peculiar to each such transaction.
¶ 47 Having made this constitutional determination, we now address the statutory implications of the issuance of a certificate of indebtedness.
B. School District Budget Process.
¶ 48 Each year, school districts are required to prepare an estimate of the districts' needs for the upcoming fiscal year.68 O.S. 2483 (1980). This estimate is then presented to the county excise board which reviews and, if appropriate, approves the estimate. 68 O.S. 2487 (1990). The approved estimate is deemed the appropriation of funds for the school district for the fiscal year. 68 O.S. 2482, 68 O.S. 2499 (1981). These appropriated amounts are then entered into the specific appropriations accounts, i.e., the general fund, building fund or other fund, by the encumbrance clerk and the treasurer of each school district. 70 O.S. 5-135(B) (1990).
¶ 49 The manner in which school districts may expend these appropriated funds is limited, however. School district funds may only be disbursed in payment of legal warrants, bonds, interest coupons and negotiable warrant-checks. 62 O.S. 471 (1990). With the minor exception of activity fund and voucher transactions, no provision exists which authorizes school districts to engage in "cash" transactions.
¶ 50 To pay the expenses normally incurred by a school district, the encumbrance clerk of the district issues a warrant against a designated fund. 70 O.S. 5-135(G) (1990). The warrant is delivered to the school district treasurer who registers the warrant by charging the appropriations account and crediting the warrants outstanding account. 70 O.S. 5-135(H) (1990). Thus, the warrant must be drawn against a specific appropriation. 62O.S. 474 (1981).
¶ 51 Warrants may be issued up to the total amount of a district's appropriation. 62 O.S. 476 (1981). However, warrants may not be issued or registered in excess of the unexpended and unencumbered amount of the district's appropriation. 62 O.S.485 (1981); 68 O.S. 2499 (1981); 70 O.S. 5-135(H) (1990). Accordingly, in determining whether a district may issue a warrant, the district must look to the estimate made and approved by the county excise board, the amount of debts already contracted against the various items of appropriations, and the amount of warrants already issued during the fiscal year. Dowlerv. State, 66 P.2d 1081, 1083 (Okla. 1937).
¶ 52 When one considers that (1) the issuance of warrants is tied to a reduction in the amount of unencumbered appropriations, and (2) there is no statutory authorization for cash expenditures, it becomes clear that the underlying premise of the school district budget system is that school districts spend appropriations, not cash. Thus, a district may "spend," i.e., incur obligations, only to the extent of its unencumbered appropriation — regardless of the amount of cash available to a district.
¶ 53 This conclusion parallels the holding of the Oklahoma Supreme Court in Dowler, supra. In Dowler, a municipality issued a number of war rants to purchase tracts of land. The excise board had not made any appropriation for the purchase of land; nevertheless, the city commissioners argued that the warrants were valid because sufficient funds were present in the general fund to redeem the warrants. In rejecting this contention, the Court held that the fact that a fund may have assets or cash on hand, in excess of the estimate made and approved by the county excise board, does not alter the rule that an obligation may not be incurred beyond the amount appropriated by the county excise board. Id. at 1083.
¶ 54 As an ancillary note, we point out that when one considers the statutory scheme described above from a broader perspective, it becomes clear that, together, these statutes accomplish certain underlying purposes. The statutes oblige school districts to (1) reasonably account for obligations of the district; (2) reflect the amount of all transactions affecting the districts; and (3) ensure that school districts do not expend funds in excess of the authorized appropriation for the fiscal year. Thus, together, the statutes all operate to ensure that school districts comply with Oklahoma's balanced budget provision. See Okla. Const. Article X, Section 26.
C. Treatment of Certificates of Indebtedness within the SchoolDistrict Budget Process.
¶ 55 70 O.S. 5-136.1 unequivocally requires that certificates of indebtedness be issued, registered and delivered. The statute states that this is to be done "in the manner and under the authority set forth for school district warrants." However, neither 70 O.S. 5-136.1, 68 O.S. 2499 (1981) nor the pertinent title 62 statutes, differentiates between the accounting treatment to be accorded to certificates of indebtedness and that given to warrants.
¶ 56 If these provisions were construed so as to mean that certificates of indebtedness must be issued, registered and delivered in "exactly the same manner" as warrants, then the issuance of a certificate of indebtedness, like the issuance of a warrant, would fall within the budget process described above. Consequently, the issuance of a certificate of indebtedness, like the issuance of a warrant, would reflect an encumbrance which would have to be deducted from the authorized appropriation of a school district. The only difference would be that while a warrant would correspond to an underlying encumbrance, such as a contract for textbooks, a certificate of indebtedness, because it represented an obligation to repay, would itself be the underlying encumbrance.
¶ 57 We observe, however, that the budget system under which school districts operate does not provide a mechanism to adjust the appropriation account to show an increase in assets available to satisfy encumbrances.[4] Once a certificate of indebtedness was issued, and the amount of the certificate was recorded as an encumbrance against a district's authorized appropriation, there would be no statutory method to reflect the availability of the proceeds of the certificate to pay the obligations of the district. Consequently, the issuance of a certificate of indebtedness would dedicate a portion of the appropriation which a school district is to "spend," but no countervailing adjustment would be made to the appropriation account to allow the district to expend the proceeds of the certificate. The net result would be that the appropriations framework, if applied, would let school districts issue certificates of indebtedness to borrow money, but would not permit them to spend the borrowed funds to finance school operations.
¶ 58 So the statute, if read to mean that certificates of indebtedness must be issued and registered "in exactly the same manner as warrants, would create a "catch-22" situation. Schools would be permitted to borrow money in anticipation of the receipt of revenues; however, if the schools did borrow money, they could not spend it on district needs.
¶ 59 As discussed above, 70 O.S. 5-136.1 is plainly intended to permit short-term financing of school district expenses. Yet under the school district budget system, a district's appropriation would be encumbered up to the amount of the certificate and the borrowed cash could not be spent on school expenses. The implication of this is clear: a construction of 70O.S. 5-136.1 which requires that certificates of indebtedness be recorded in "exactly the same manner" as warrants defeats the purpose of the statute.
¶ 60 However, in Oklahoma it is well settled that the fundamental goal of statutory construction is to ascertain the intent of the legislature and give effect to that intention.Jackson v. Independent School Dist. No. 16 of Payne County,648 P.2d 26 (Okla. 1982). The apparent purpose of a statute is not to be sacrificed to a literal construction. Wood v. IndependentSchool Dist. No. 141 of Pottawatomie County, 661 P.2d 892 (Okla. 1983). Rather, in construing statutes one is to assume that the legislature has not done a vain or useless thing. Farris v.Cannon, 649 P.2d 529 (Okla. 1982). To this end, statutes are to be construed in such a manner as to give meaning to each portion of the statute and not so that the statute is rendered superfluous. Anderson v. O'Donoghue, 677 P.2d 648 (Okla. 1983).
¶ 61 In accordance with the foregoing rules of construction, it is our duty to reconcile, if possible, the transaction that 70O.S. 5-136.1 was clearly intended to authorize with the statutory accounting framework within which certificates of indebtedness exist.
¶ 62 Returning to the language of 70 O.S. 6-136.1, we observe that the statute undoubtedly requires that certificates of indebtedness be issued, registered and delivered. However, the statute only requires that this be done "in the manner" set forth for warrants. In keeping with our duty to construe the statute so as to give effect to the legislative intention, we conclude that this language requires that certificates of indebtedness be issued, registered and delivered in a method "similar" to that set forth for school district warrants.[5]
¶ 63 While the Legislature intended that certificates of indebtedness be issued, delivered and registered in a manner "similar" to that of warrants, 70 O.S. 5-136.1 does not spell out a clear methodology to be followed in meeting this intention. But turning again to the language of the specific statute, we can be certain of two points. First, that by requiring that certificates of indebtedness be "issued, registered and delivered," the Legislature intended that districts memorialize or record transactions relating to the certificates. And second, that by linking the system by which certificates of indebtedness are to be "issued, registered and delivered" to the method by which warrants are recorded, the Legislature intended that any system employed by school districts to account for the certificates should accomplish the same objectives as the framework for warrants.
¶ 64 Accordingly, any "similar" method must not only memorialize certificate of indebtedness transactions, but also must, like the warrant system, (1) reasonably account for any certificates of indebtedness issued by a district; (2) reflect the amount of all certificate of indebtedness transactions affecting the district; and (3) protect a district from expending funds in excess of its income and revenue for the fiscal year, so ensuring that districts comply with the strictures of Article X, Section 26 of the Oklahoma Constitution.
¶ 65 In this regard, we observe that both the State Board of Education and the State Auditor and Inspector are authorized to play a role in setting the specific accounting procedures to be used by districts, which could include the accounting for certificate of indebtedness transactions. See, 68 O.S. 2484(B) (1990); 70 O.S. 22-113 (1981); 70 O.S. 3-104(18) and 70 O.S.6-135(J) (1990).
¶ 66 Finally, in response to your specific question, we conclude that 70 O.S. 6-136.1 does not necessarily require that certificates of indebtedness be shown as a debt or encumbered against the appropriations of a district. This conclusion is consonant with our determination that the issuance of a certificate of indebtedness does not create "debt" within the meaning of Article X, Section 26 of the Oklahoma Constitution, provided that the proceeds from the issuance of these certificates are set aside specifically to pay otherwise lawful obligations of the district.
 IV.
¶ 67 Your third question asks: How may the proceeds derived from the issuance of certificates of indebtedness be invested? The answer to this question varies with the method through which the certificates are sold.
¶ 68 Where certificates of indebtedness are issued and sold for cash, school districts may invest the proceeds, to the extent they are not currently expended, in the specific instruments listed in 62 O.S. 348.1 (1990) and 70 O.S. 5-115 (1990). Seegenerally, A.G. Opin. No. 89-064. Thus, certificate of indebtedness proceeds are treated like any other funds held by school districts.
¶ 69 However, where the certificates are sold pursuant to the special provisions of 70 O.S. 5-136.1, the investment authority of the school districts is effectively enlarged, as to the proceeds of the certificates. As noted above, 70 O.S. 5-136.1
provides that certificates of indebtedness may be "purchased for value through the funding of uncollateralized investments made for the benefit of and on behalf of the school district." That is, 70 O.S. 5-136.1 authorizes transactions in which school districts issue certificates of indebtedness to purchasers, and in exchange, the purchasers fund uncollateralized investments on behalf of the districts. In such transactions, the proceeds that the districts receive are, of course, the uncollateralized investments made on behalf of the districts. Thus, 5-136.1 essentially authorizes the indirect investment of the proceeds from the issuance of certificates of indebtedness in uncollateralized investments.
¶ 70 Accordingly, 70 O.S. 5-136.1 represents a departure from the traditional manner of investing school district funds. In contrast to the restrictions contained in 62 O.S. 348.1 (1990) and 70 O.S. 5-115 (1990), the statute under consideration here,70 O.S. 5-136.1, allows the proceeds of school district obligations, i.e., public funds, to be placed, albeit indirectly, in uncollateralized investments — without seeking to limit the nature or quality of these "uncollateralized investments." In this respect, 70 O.S. 5-136.1 stands virtually alone in the statutory law of Oklahoma.
 V.
¶ 71 In your final question, you ask about the potential consequences a school district faces if, through the issuance of a certificate of indebtedness or by other means, it incurs an obligation in excess of its appropriation or estimate of needs for the fiscal year in which the obligation is issued.
¶ 72 As we have pointed out earlier, where a school district issues a certificate of indebtedness, and the proceeds of the certificate are not dedicated to the payment of lawful debts of the district, additional debt may be created.
¶ 73 If a school district, through the creation of such additional indebtedness, exceeds its appropriation as approved by the excise board for the fiscal year, then the obligation is not a lawful charge against the district. See, 62 O.S. 479
(1981). The obligation is of no binding or legal force, as against the district. Threadgill v. Peterson, 219 P. 389 (Okla. 1923). Rather, to the extent that any such obligation exceeds the district's appropriation, the obligation is avoid." State exrel. Awtrey v. Randolph, 281 P. 956 (Okla. 1929). See alsoBoard of Commissioners of LeFlore County v. Central Nat. Bank ofPoteau, 41 P.2d 853 (Okla. 1935).
¶ 74 However, pursuant to 62 O.S. 479 (1981), any district official responsible for "contracting, incurring, acknowledging, approving or authorizing" an obligation beyond the district's authorized appropriation is civilly liable for the amount of any such excess indebtedness. Accordingly, the remedy of a creditor who holds an invalid obligation is to bring an action against the district officials that authorized the obligation. J.B. KleinIron Foundry Co. v. Board of Commissioners of Canadian County,61 P.2d 1055 (Okla. 1936).
¶ 75 Furthermore, 62 O.S. 480 (1981) imposes criminal liability upon any officer who permits transactions which exceed a district's authorized appropriation. This statute also provides that an officer who permits such transactions "shall forfeit and be removed from his office." Id. Similarly, 62 O.S. 478
(1981) imposes identical liability to any treasurer who permits transactions beyond a district's authorized appropriation.
 VI. ¶ 76 It is, therefore, the official opinion of the AttorneyGeneral that:
 1. Title 70 O.S. 5-136.1 (1990), authorizes schooldistricts to issue certificates of indebtedness to fund theestimated costs of operations, capital expenditures or otherlawful costs of the school district for the current fiscal year.70 O.S. 5-136.1 does not, however, authorize school districtsto issue certificates of indebtedness for the purpose ofgenerating additional investment revenue.
 In addition, if school districts issue certificates ofindebtedness and intentionally use the proceeds, or any portionof the proceeds, to (1) acquire higher yielding investments, or(2) replace funds which were used to acquire higher yieldinginvestments, the certificates may be deemed "arbitrage bonds" andstripped of their tax-exempt status pursuant to 26 U.S.C.A. 103and 148 (1991).
 2. (a) If the proceeds of a certificate of indebtedness areset aside for the sole purpose of paying the other lawfulobligations of the school district, then no new "debt," withinthe meaning of Article X, Section 26 of the OklahomaConstitution, is created. Conversely, to the extent that theproceeds of a certificate of indebtedness are not dedicated tosatisfying the collateral obligations of a district, the issuanceof the certificate may result in the creation of new "debt,"within the meaning of Article X, Section 26 of the Constitution,which would be unlawful absent a prior vote of the people.Because 70 O.S. 5-136.1 (1990) does not specifically addressthis concern, whether the issuance of a certificate ofindebtedness gives rise to new debt will be dependent upon thevarying factual circumstances peculiar to each such transaction.
 (b) Pursuant to 70 O.S. 5-136.1 (1990), certificates ofindebtedness must be issued, registered and delivered in a method"similar" to that set forth for school district warrants. Any"similar" method must not only memorialize certificate ofindebtedness transactions, but also must, like the warrantsystem, (1) reasonably account for any certificates ofindebtedness issued by a district; (2) reflect the amount of allcertificate of indebtedness transactions affecting the district;and (3) protect a district from expending funds in excess of itsincome and revenue for the fiscal year to ensure that districtscomply with the strictures of Article X, Section 26 of theOklahoma Constitution.
 (c) Pursuant to 68 O.S. 2484(B) (1990), 70 O.S. 22-113(1981) and 70 O.S. 3-104(18) and 70 O.S. 5-135(J)(1990), both the State Board of Education and the State Auditorand Inspector are authorized to play a role in setting thespecific accounting procedures to be used by districts, whichcould include the accounting for certificate of indebtednesstransactions.
 3. The proceeds of certificates of indebtedness may beinvested in two ways. First, proceeds may, pursuant to 62 O.S.348.1 (1990) and 70 O.S. 5-115 (1990), be directly investedlike any other funds held by school districts. Secondly, theproceeds may, pursuant to 70 O.S. 5-136.1 (1990), beindirectly invested, for the benefit of the school district, inuncollateralized investments.
 4. If a school district incurs an indebtedness in excess ofthe district's authorized appropriation for the fiscal year, theobligation is not, pursuant to 62 O.S. 479 (1981), a lawfulcharge against the district and is, therefore, "void." However,pursuant to 62 O.S. 479 (1981), any district officialresponsible for "contracting, incurring, acknowledging, approvingor authorizing" an obligation beyond the district's authorizedappropriation is civilly liable for the amount of any such excessindebtedness. Furthermore, 62 O.S. 478 and 62 O.S. 480(1981) impose criminal liability upon, respectively, anytreasurer or officer who permits transactions which exceed adistrict's authorized appropriation.
ROBERT H. HENRY ATTORNEY GENERAL OF OKLAHOMA
K.W. JOHNSTON ASSISTANT ATTORNEY GENERAL
[1] We emphasize, however, that there is no single, identifiable "cash management program." Rather, there are a number of programs available. Moreover, each of these programs consists of a series of complicated legal and financial transactions which may vary from program to program, underwriter to underwriter, and year to year.
[2] Other courts have accepted the concept that there is no material difference in the two "deficit-funding" methods for constitutional purposes. See, e.g. Flournoy v. Priest,486 P.2d 689, 691 (Cal. 1971) (as noted earlier, that Court in this case observed that issuing a single tax anticipation note was a more orderly and economical way to cover deficits than the "haphazard" warrant method).
[3] In 1985, Attorney General Turpen approved a similar concept in upholding the constitutionality of the General Obligation Public Securities Refunding Act, 62 O.S. Supp. 1990, §§ 751[62-751] et seq. See A.G. Opin. No. 85-184. This opinion found that no new debt was created when "Advanced Refunding Bonds" were issued, with the proceeds placed in an escrow account to retire previously authorized general obligation bond issues. The constitutionality of the statutes was upheld by the Oklahoma Court of Appeals in an unpublished opinion. Boyd v. IndependentSchool Districts No. 1 and No. 89 of Oklahoma County, Case No. 70,412 (Okl.App.February 21, 1989).
[4] The only statutory method to adjust the appropriations account is for the county excise board to approve a supplemental appropriation. See 68 O.S. 1981, § 24101[68-24101]. An appropriation may only be financed, however, out of surplus cash, current taxes and estimated income reasonably expected to be collected promptly.Sinclair-Prairie Pipe Line Co. v. Excise Board, 42 P.2d 501
(Okla. 1935). Because the proceeds from the issuance of a certificate of indebtedness are properly characterized as loan proceeds, and not as surplus cash, current tax revenue or other income, § 24101 cannot provide a legitimate basis for the appropriation of these funds.
[5] To the extent, if any, that the relevant title 62 and title 68 statutes may be read in a manner inconsistent with this conclusion, we note that these statutes will be deemed to be modified by § 5-136.1, the latest declaration of the Legislature, See City of Sand Springs v. Department of Public Welfare,608 P.2d 1139 (Okla. 1980).